UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIONTE JAMAL SIMPSON, BE0603,<br><br>                                Petitioner,<br><br>v.<br><br>MOORE, et al.,<br><br>                                Respondent(s). | Case No.:  21-cv-01763-CAB-JLB<br><br>**REPORT AND RECOMMENDATION RE: AMENDED PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[ECF No. 30]** |

This Report and Recommendation is submitted to the Honorable Cathy Ann Bencivengo, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rules 72.1(d) and HC.2(e) of the United States District Court for the Southern District of California.  On October 12, 2021, Petitioner Dionte Jamal Simpson ("Petitioner" or "Simpson"), a state prisoner, proceeding *pro se*, commenced these habeas corpus proceedings pursuant to 28 U.S.C. § 2254 by filing a petition for writ of habeas corpus. (ECF No. 1.)

On April 30, 2024, Petitioner, now represented, filed a verified first amended petition for writ of habeas corpus ("Petition").  (ECF No. 30 ("Pet.").)  Respondent filed an answer (ECF No. 34) and lodged the state court record (ECF Nos. 35–39).  Petitioner filed a traverse.  (ECF No. 41.)

This Court has considered the Petition, answer, traverse, lodgments, and all supporting documents filed by the parties. For the reasons set forth below, this Court **RECOMMENDS** that the Petition be **DENIED**.

## I.    FACTUAL BACKGROUND

The following facts are taken from the California Court of Appeal's[1] March 27, 2023, opinion in *People v. Ware*, *et al.*, Appeal No. DO72515:[2]

> Dionte Simpson, Victor Ware, and Nicholas Hoskins (collectively appellants) are Members of 5/9 Brim (Brim), a criminal street gang in San Diego that is a set of the Bloods gang. The Neighborhood Crips (NC) and West Coast Crips (WCC), (together, the Crips), other criminal street gangs, are the main rivals of the Brims.
>
> . . .
>
> *Prosecution's Gang Expert*
>
> On April 11, 2011, Dereck Peppers, a respected Brim gang member known as an "original gangster" was killed in Brim territory. Police suspected that a rival Crips gang member had murdered Peppers. Simpson and Ware knew Peppers. Peppers's murder sparked a gang war between Brim and WCC and spiked the number of homicides attributed to African-American gangs.
>
> Appellants were Brim gang members and members of a Brim subset known as Tiny Hit Squad. Young Hit Squad was another Brim subset. At some point Tiny Hit Squad and Young Hit Squad merged, creating a commingled group known as Hit Squad. A "hit" means to kill someone. Members of the Hit Squad included appellants and alleged coconspirators, Lamont Holman, Mykein Price, Timothy Hurst, Emanuel Peavy, Damonte

---

[1]    All references herein to the Court of Appeal refer to the California Court of Appeal.

[2]    This Court presumes the state court's factual determinations to be correct, absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Petitioner argues that the Court of Appeal's decision is not entitled to the presumption of correctness, but for the reasons discussed herein, the Court finds that Petitioner has not rebutted the presumption with clear and convincing evidence. (*See* ECF No. 30-1 at 14, 22, 23, 26, 29–30, 31, 39.)

Lucas, Clyde[3] Ellis, Rahman Taylor, Nino Sanchez, Deondre Cooper, Leron Johnson, Jamon Smith, Edward Laplanche, Edward Paris, Aaron Hurst, Norman Sanchez, Maurice Chavarry, Sherbly Gordon, and Steven Mahaney. Brandin Orchord was also a Brim member and a member of Young Hit Squad. Jontae Jones was a member of the Hit Squad.

A gang that has been the target of a shooting by a rival gang is expected to retaliate or "get back" at the rival gang. A rival gang graffitiing in another gang's territory would also require retaliation. Failure to retaliate would make the gang appear weak and invite other gangs to prey on its members. The retaliation has to be equal to the insult suffered, but is preferably "one step above."

Blood gangs, including Brim, associate with the color red. Crips gang members traditionally wear blue. Gang members "put[] in work" for a gang by going on missions, such as committing burglaries, robberies or shootings. For shootings, gang members go into rival gang territory to seek rival gang members. A gang member on a mission might target a particular rival gang member. If the target cannot be located, the gang member will look for a substitute, such as someone dressed in the rival gang's color.

Gang members share guns. For example, in one 24-hour period the prosecution gang expert saw that one gun had been used by three different gang members. When it is time to go on a mission, a gang member will pick up a gun and pass it off to the person on the mission and then return the gun so that other gang members would have access to it. Gang members often store their guns at the home of a female who is not on parole or probation.

The gang expert reviewed a large amount of social media evidence pertaining to Brim gang members and explained to the jury how social media worked. The gang expert believed that gang members in a set knew when other gang members in the same set had engaged in or were part of criminal activity as evidenced by social media posts. Gang membership does not end when an individual goes into custody. Gang members in custody still have access to cell phones and social media. Gang members also monitor rival gangs on social media.

It is common for Brim gang members to replace the letter "C" with a "K" or to place the letter "K" after the letter "C." The letter "k" after the letter

---

[3]    [footnote in original] Our conclusion that the trial court did not err renders it unnecessary to address Simpson's and Hoskin's cumulative error claim.

3

21-cv-01763-CAB-JLB

"c" refers to "Crip Killer." Blood gang members also replace the letter "c" with the letter "b" when writing. For example, the word "cool" becomes "bool." "Crab," "Nap bashing," "Toasty K," "wet toast" or "west toast" are derogatory terms for NC or WCC.

*June 14, 2011 - Simpson's Attempted Murder and Assault with Firearm Convictions (Counts 2-5)*

On this day a group of five men, including Simpson, Orchord, Paris, and Chavarry started arguing with two Crips gang members on a street corner. Paris and Orchord began throwing gang signs with their hands. As the two Crips started to walk away, Simpson pulled out a gun, someone said "Fuck Crabs" and Simpson fired two or three shots. The two rival gang members fled. Simpson gave the gun to Orchord, who subsequently hid it in his garage.

After learning that the suspect group might be inside Orchord's apartment, police officers went to the apartment where they eventually contacted Orchord and Paris. Officers later found Simpson and Lucas hiding in the attic and Chavarry hiding under some clothing. Officers found a loaded revolver about a foot from where Simpson had been hiding.

Officers who responded to the scene located two expended .45-caliber shell casings in the front yard of a residence, and a bullet further down the street. During a search of Orchord's residence officers found a loaded .45-caliber semiautomatic firearm hidden in the garage. Subsequent ballistics tests linked this firearm to the shooting.

Police placed Simpson and Lucas in the back of a patrol car and the prosecution played their recorded conversation for the jury. The gang expert also interpreted some of the conversation. When Lucas commented that the police have not "found the other one," Simpson told him to shut up and explained to him why the police put them in the back of a patrol car together. This was an example of an older gang member schooling a younger one on police investigations.

When Lucas said, "they found the second one," Simpson's commented, "On Brims," asking Lucas to swear on the gang that police had found both guns. The gang expert interpreted Simpson's reply, "I got life," as an admission that he knew a gun would be linked to a shooting and there may be evidence connecting him to the shooting. Simpson and Lucas also discussed who would take the responsibility for the gun, with Simpson telling Lucas that he should accept the charge and take the hit for the gang because he was the youngest.

4

The garage contained Brim gang graffiti that included the gang monikers for Paris, Johnson, Chavarry, Hoskins, Orchord, Ware, and Peavy. The graffiti referenced "CK" meaning "Crip Killing" and "crab" which is a derogatory term for a Crips gang member.

*January 2012 Shootings (Overt Acts 1-5)*

On January 3, 2012, a man with a dark complexion fired shots in WCC territory and then escaped in a vehicle. Later that day, a shooting took place in Brim territory. Two days later a third shooting took place in Brim territory. Bullet casings recovered from that shooting, matched the first shooting, suggesting to the expert that these shootings were consistent with "get back."

*April 1, 2012 - Murder of M.B. (Overt Acts 4-6)*

On April 1, 2012, M.B. was fatally shot. M.B., who was not a gang member, was in Crips territory while wearing all blue clothing. The gang expert considered this shooting to be a "mission" because an armed Brim gang member went to rival gang territory and shot a person without knowing whether that person was part of the rival gang. Ballistics testing conducted on cartridge casings recovered at the scene tied these casings to a nine-millimeter gun used during the shooting on April 4, 2012. Police recovered this gun on April 5, 2012, during a contact with coconspirators Norman Sanchez, Smith, and Lucas.

*April 3, 2012 - Murder of W.L.*

On this day, W.L., a nongang member, was fatally shot in the face by a Black person driving a stolen vehicle. Police later arrested coconspirator Ellis with the murder weapon.

*April 4, 2012 - Attempted Murder of T.L. (Overt Acts 7-11) and Simpson Gang Conspiracy (Count 6)*

On this day, NC gang member T.L., W.L.'s son, was shot by a memorial set up near the location of his father's shooting. Police recovered nine-millimeter casings from the scene. The casings were from two separate firearms, one of which was the same firearm used to kill M.B. three days earlier. One of the firearms was also used for return fire during the January 5, 2012 shooting.

Following their arrest for possessing a firearm, police placed Smith and Norman Sanchez in a patrol car together and recorded their conversation. Smith stated, "They found that thing," referring to the gun officers found.

5

Later in the recording, Norman Sanchez said, "We did this ride shit for the homie." The gang expert explained that a "ride" means going on a mission for the gang. "For the homie," meant that the men did the shooting on someone's behalf, such as getting payback for a shooting that occurred in Brim territory. Norman Sanchez and Lucas later pleaded guilty to this shooting.

Police linked the nine-millimeter Beretta handgun recovered during Smith and Norman Sanchez's arrest to the April 1 and April 4, 2012 shootings. The gang expert opined that this shooting and the April 1 shooting were consistent with a gang mission because the gun was used multiple times in rival gang territory. Additionally, these shootings were committed at the beginning of the week that NC celebrated its gang, which is April 1 through 7.

On April 9, 2012, a social media status update on Hoskins's account stated, "Son was born healthy. Crossys got Hit. All I need is some Dro and my day is set. LOL. [#]Happy Easter." The gang expert explained that a "crossy" is a rival Crips gang member and that the post referenced the shooting of a Crips gang member.

*May 2, 2012 - Arrest of Simpson's Girlfriend in Possession of Firearm Linked to Three Shootings*

In the early morning hours on this day, an officer contacted Adrianna P. as she walked down the street in violation of curfew. A search of Adrianna's cell phone revealed "Blood" gang terminology in several text messages, some of which were attributed to Simpson. The officer recovered a loaded nine-millimeter firearm from Adrianna's purse. Testing revealed that this gun had been used during the January 5, 2012 shooting, the January 7, 2012 shooting, and April 4, 2012 shooting.

During a police interview, Adrianna admitted that Simpson fathered her child and that he had given her the gun immediately before the officer contacted her.[4] She stated that everyone looked up to Simpson and that he got all the guns. She claimed that he passed guns to lots of people including, coconspirators Norman Sanchez, Lucas, and Paris. Adrianna stated that

---

[4]    [footnote in original] During trial, Adrianna's story changed. She stated that she found the gun and decided to keep it. She admitted dating Simpson, but claimed that she did not know who fathered her child.

Simpson called Nino Sanchez "his son," and that Nino looked to Simpson as a father.

*May 11, 2012 - Murder of C.T. (Overt Acts 12-14)*

On this day, C.T., a nongang member, was in NC territory when a drive-by shooter shot and killed him. The night before C.T. was killed, a post appeared on Hoskins's social media page stating, "I'm making a lot of stupid decisions but [I don't give a fuck]. Deal with the consequences when they get here. #[you only Brim once]."

*June 4, 2012 - Recovery of Smith & Wesson Handgun from a Brim Gang Member*

On this day, police officers arrested Brim member Calvin Hunt for an outstanding warrant. After dropping Hunt off at jail for processing, officers discovered a loaded Smith & Wesson .40-caliber handgun on the floorboard of the backseat of their patrol car. The gun had been was used for C.T.'s murder on May 11, 2012, and contained Ellis's DNA. The gang expert concluded that the firearm was a gang gun used by multiple Brim gang members.

*June 18, 2013 - Attempted Murder of D.S. (Overt Acts 31-34)*

On this day Orchord went to D.S.'s residence with a female companion under the premise that she had a hair appointment with D.S. When D.S., who was not a gang member, opened his door, Orchord stepped out from behind his companion, said "What's up Blood," and shot D.S. in the chest.

The next day, Paris posted on his public Facebook page a photograph of Orchord, Paris, Price, and Taylor entitled "Crab say the Brims aren't here, Don't near [nigga]. Won't war with us." In the photograph, Orchord was tossing "Brim" with one hand and "Crip killer" with the other hand. Paris had a revolver pointed at a "W" made with his other hand, which disrespected WCC. Taylor had a gun in his waistband, and Price was spelling out "Blood" with his hands. The gang expert interpreted this post as a threat to rival Crips gang members, leading to possible retaliation by the Crips.

Officers sought the individuals in the photograph in different Brim locations. They located Paris and Orchord, who wore the same clothing depicted in the photograph. Simpson, Jones, another Brim member, and some girls were with them. One officer observed Jones discard a firearm in a

trashcan. The gun, a .22-caliber revolver, contained Orchord's DNA and was the gun used to shoot D.S.

Officers placed Simpson and Paris in the back of a patrol car and recorded their conversation. In the recording, Simpson sounded very angry and excited. Simpson swore loyalty to Brim and referenced Hit Squad multiple times. Police took Simpson into custody that day for possessing narcotics for sale and recklessly evading a police officer. He has remained in custody since that date.

*August 27, 2013 - Attempted Murder of B.T. (Overt Acts 38-42) and Hoskins's Gang Conspiracy (Count 7)*

On this date, B.T., a Lincoln Park gang member, was walking in WCC territory when a white minivan approached him. A passenger leaned out of the minivan's window and began firing in Taylor's direction. The shooter was a Black male wearing a black T-shirt with a red bandana over his face. The driver of the minivan was a Black male wearing a white T-shirt with hair braided in cornrows. Further investigation revealed that the minivan was registered to Brim gang member Timothy Hurst. Hurst was convicted for this shooting.

The gang expert stated that this shooting was consistent with a hunting mission looking for a potential rival, but the person shot at was not a rival. Officers collected .40 caliber casings from the scene. This firearm was later used in two other shootings: (1) the October 22, 2013, drive-by shooting of N.C. inside Crips territory; and (2) the October 23, 2013, shooting toward three African-American males who were inside a garage at a nearby apartment. An affiliate of WCC lived in an apartment adjacent to the garage. Police recovered the firearm used for this shooting from coconspirators Mahaney and Nino Sanchez.

Hurst's cell phone contained Hoskins's contact information. Hoskins's grandmother lived next door to Hurst's grandmother. Police found Hoskins's DNA on the passenger side interior door of the minivan. About six months before this shooting, Hoskins's social media account displayed a photograph of Hurst in front of a WCC hangout about a mile from the August 27 shooting. In the photograph, Hurst was tossing up Brim and Crips killer hand signs.

On August 27, 2013, Paris's social media account displayed two photographs of Hoskins and Paris in WCC territory, also about a mile or so from the shooting location, throwing up gang signs disrespectful to Crips. On February 27, 2014, Hoskins's social media account had a post stating, "I

switch up on bitckh (N word), fast. I love my bros, but I'm truer to the code shit. I turn on TB if he does some gay shit and vice versa. Nothing personal. #one Brims." The gang expert explained that Hoskins was accusing Timothy Hurst, aka Tim Brim (TB), of snitching and was saying that if somebody snitched on him, he would go after them because he was truer to the code of no snitching.

*December 14, 2013 - Attempted Murder of N.S. and T.W. (Overt Acts 61-63)*

On this day, the two victims, a WCC associate and an affiliate of a Brim rival, were shot in Brim territory. The gang expert explained that the rival gang members were shot because they "trespass[ed]" in Brim territory. He considered the shooting to be a proliferation of the war between the two rival gangs. Officers recovered 18 expended nine-millimeter casings from two firearms. They also found a loaded magazine for a semiautomatic handgun that contained Nino Sanchez's DNA.

*December 15, 2013 - Attempted Murder (Overt Acts 63-65)*

On this day two African-American males approached a residence in WCC gang territory on foot and fired shots. After the shooting, officers observed a WCC gang member yelling. The next day, Hoskins's social media account contained a post stating, "I'm tired of grinding, fighting, running, jail, death, stress, betrayal, and everything else this game has to offer. But it's what we signed up for. Right?"

Officers recovered one expended .40-caliber casing and 11 expended nine-millimeter casings from the scene. Ballistics testing linked eight of the nine-millimeter casings to the firearm used in shootings that occurred on March 2, 2014, April 12, 2014, and April 15, 2014.[5] Coconspirator Peavy was charged with the April shootings and coconspirator Holman was charged with the March shooting.

Police later arrested coconspirator Price in possession of a .40 caliber semiautomatic pistol determined to be the second firearm used in this shooting

---

[5] [footnote in original] The March 2, 2014, shooting occurred in WCC gang territory toward a WCC affiliate and his girlfriend. The day before this shooting, the following message appeared on Hoskins's social media account, "I realize why they want me off the streets. I'm a loose [cannon]. Unpredictable. Threat to society and myself. LOL. [#]fucK it."

and the shooting the day before.  Price made a jailhouse call to coconspirator Peavy telling Peavy that he had been arrested with the gun and would take the blame for the gun.

*January 29, 2014 - Ware Arrest for Possessing a Firearm (Count 8)*

On this day, officers contacted Ware and found a loaded nine-millimeter handgun tucked into his waistband.  At trial, the parties stipulated that Ware had a prior felony conviction.  After his arrest, Ware made a jailhouse call to a female and talked about being arrested with a gun.  He said that he needed to slow down because he was "doing a gang of shit," and was glad he only got locked up for gun possession.

*March 25, 2014 - Ware's Attempted Murder and Gang Conspiracy Convictions (Counts 9-10 and Overt Acts 76-81)*

On the afternoon of March 25, 2014, Ware drove his gold Lexus into "the most active area" in WCC territory at the time.  Based on his experience, a detective stated that this WCC territory was "absolutely" a good place to find rival WCC gang members.  The passenger, a young African-American male with cornrows wearing a black hoodie fired several shots at M.W., a WCC gang member.  One witness then saw the shooter get out of the car and chase M.W., while firing his weapon.  This witness saw no one else on the street that could have been the shooter's target.  Eight minutes after the shooting and about a mile from where it occurred, officers found the abandoned Lexus and Ware in Brim territory.

Officers collected nine-millimeter casings, all from the same firearm, from the scene.  Police did not match these casings to any other shooting.  Surveillance video obtained from a school showed Ware driving around WCC territory before the shooting.  The gang expert opined that the shooting was gang motivated and that Ware drove around rival gang territory on a mission looking for the target rival gang member.

Inside the Lexus, officers found a letter with the name "Victor Boston" on it, which was Ware's nickname.  The letter was addressed to M.H., a Lincoln Park gang member.  The Lincoln Park gang is an ally of the Brim gang.  The letter referenced Ware's purchase of the Lexus.  In the letter, Ware states, "I'm hella triv out here, squad.  I might looking at some [jail] time myself.  They found two challys of mine and that little sawed-off with my print, bro."  The gang expert explained that Ware was telling M.H that they found two of his guns as well as a sawed-off shotgun with his fingerprint.  In the letter, Ware also wrote, "Gon' learn one day. CK."  Meaning people will

learn about Crip Killing.  Ware also wrote "I have nothing to talk about.  I'll take it all on the chin.  Then do it again.  Brim gang."  The gang expert opined that this passage meant Ware would not snitch, but he would take responsibility for the guns and do more shootings or Crip killing.

A few lines down, he said, "Bro, it's snitches in the set.  I'll type weird shit, but I just wanted you to know I was out here and I got you.  Get with me, bro, ASAP."  Here, Ware was telling M.H. that things were weird among the gang and people in the gang might be cooperating with law enforcement.  At the bottom of the letter, Ware said "I'm not on paperwork," which meant he was not on a probation or parole Fourth Amendment waiver status.  Ware signed the letter "H$" and "THS" which referred to Hit Squad and Tiny Hit Squad.

### April 12, 2014 - Murder of G.B. (Overt Acts 89-94)

On this day two men jumped out of a car and walked up to WCC gang member G.B. and his cousin.  One of the men asked, "What's that Brim life like?" and both opened fire on G.B.  G.B. died after being shot nine times.

Officers recovered 19 expended nine-millimeter casings from the crime scene that had been fired from two separate firearms.  Testing of these casings uncovered the DNA of coconspirators Peavy and Holman. Cell phone records revealed communications between Peavy and Holman before the murder.  During the investigation, law enforcement recorded a holding cell conversation between Peavy and Holman.  The men discussed this murder and the finding of their DNA on the shell casings from the murder scene.  Holman said, "No doubt. We fucked up, homie."

### April 15, 2014 - Attempted Murder of B.T. (Overt Acts 96-100)

On this day B.T., a WCC associate and two other men were standing in an area close to WCC gang territory.  A silver Ford Taurus that matched the vehicle involved in the March 2, 2014 shooting, parked nearby.  A man, later identified as coconspirator Peavy got out of the driver's side of the Taurus, approached the men and asked "This is Crip? This is Crip?"  B.T. responded, "Ain't nobody on no gangbanging shit out here."  Peavy pulled a gun and fired at B.T., with one round hitting B.T. in the foot. Peavy ran back to the Taurus and the car sped away.  Further investigation revealed that Peavy's girlfriend had rented the Taurus on February 15.

After this shooting several social media posts appeared on Hoskins's account, including one on the day of the shooting stating, "I ain't going to

survive too much longer in Dago.  Too much shit going on, and I can't keep my ass out of the mix."  The next day, the following post appeared on Hoskins's account, "The status of an OG . . . isn't established by age or how long you been around.  I mean it count but you need the stripes and reputation to match.  Big homie. LOL."  The gang expert explained that a gang member needs put in to work to gain OG or original gangster status.

On April 17, 2014, the following appeared on Hoskins's account, "Think about it. We all young, dumb, black, and ain't turning down shit.  We all think we tough.  All of us got too much pride to take a loss.  What you think going to happen when we butt heads. [Bl59d].  That's what."  The gang expert explained that the author had too much pride to walk away or take a loss, would not turn down a fight or gunfight, and would move forward to the end.

On April 20, 2014, a photograph appeared on coconspirator Gordon's social media page showing Gordon tossing up "fuck nappy heads," and captioned, "The Blood, Little Bick Nick."  A status update on this account said, "It's a new Brim and town, and he mash on everybody.  Ain't fucking with the Brims or him.  They call him Little Bick Nick."  The gang expert explained these posts announcing that Gordon had received the gang name "Little Bick Nick" and that he will fight any Brim rival.  A comment on this post from Hoskins's account stated, "I'm Big Bick Nick. CKA Baby Mikey.  Sherb know what's bracking. Brim bidness." The gang expert explained that Hoskins was "Bick Nick" and "Baby Mikey" and that "CKA" was a reference to Crip killing and was used instead of putting "aka." The gang expert further explained that for a young gang member to take your name, such as Gordon taking Hoskins's, there had to be a level of respect and it meant the older gang member was working towards rider or original gangster status.

(ECF No. 39-1 at 2, 6–19.)

## II.    PROCEDURAL BACKGROUND

### A.    Petitioner's Criminal Conviction and Direct Appeal

On May 20, 2016, Petitioner was found guilty by a jury of the following crimes:

- Count 1: Between January 1, 2012, and April 23, 2014, conspired to commit murder (Cal. Penal Code §§ 182(a), 187) for the benefit of a criminal street gang.  (§ 186.22(b)(1).)

///

- <u>Counts 2 and 3</u>: June 14, 2011, attempted murder of Victims 1 and 2 (§§ 664, 187(a)) involving the personal use of a firearm (§ 12022.53(b), (c), and (e)(1)), and for the benefit of a street gang.  (§ 186.22(b)(1).)

- <u>Counts 4 and 5</u>: June 14, 2011, assaulted Victims 1 and 2 with a firearm (§ 245(b)) for the benefit of a street gang. (§ 186.22(b)(1).)

- <u>Count 6</u>: April 4, 2012, participated in a criminal street gang conspiracy (§ 182.5) for the crime of premeditated attempted murder committed on or about April 4, 2012. (§§ 664, 187, 189.)

(ECF No. 39-1 at 2.)  On June 23, 2017, the trial court sentenced Petitioner to 36 years plus 25 years to life.  (*Id.* at 3; *see also* ECF Nos. 38-3 at 68.)

On July 26, 2017, Petitioner filed a Notice of Appeal.  (ECF No. 38-17 at 1.)  On June 8, 2018, Petitioner filed his opening brief before the Court of Appeal.  (ECF No. 38-9.)  Petitioner argued the following: (1) insufficient evidence supporting his conviction for conspiracy to commit murder (Count 1); (2) the conspiracy conviction (Count 1) must be reversed because the jury was allowed to consider overt acts after the conspiracy terminated and overt acts that were not proven; (3) instructional error, *i.e.*, the reading of CALCRIM 418 allowed the jury to convict based on a lesser burden of proof; (4) insufficient evidence to prove attempted murder (Counts 2 and 3) or assault with a semi-automatic firearm (Counts 4 and 5); (5) insufficient evidence of criminal street gang conspiracy (Count 6); and (6) cumulative error.  (*Id.*)

On July 21, 2020, the Court of Appeal affirmed in part, reversed in part, and remanded for resentencing.  (ECF No. 38-14 at 93.)  The Court of Appeal specifically reversed Petitioner's conviction for gang conspiracy (Count 6) and vacated his sentence. (*Id.*)  Petitioner's sentence was vacated, and the case was remanded for resentencing to allow the trial court to exercise its discretion to strike the firearm use enhancements attached to Counts 2 and 3 pursuant to California Penal Code §§ 1385, 12022.53(h).  (*Id.*; *see also* ECF No. 38-18 at 6.)  The Court of Appeal's order was modified on July 29, 2020,

and modified again after denial of rehearing on August 12, 2020. (ECF Nos. 38-15; 39-1 at 4, n.2.)

On August 17, 2020, Petitioner filed a petition for review in the California Supreme Court. (ECF No. 38-16.) On December 9, 2020, the petition was summarily denied. (ECF Nos. 30 at 4; 38-17 at 7.) However, the California Supreme Court granted the petition for review filed by Nicholas Hoskins and issued an opinion on December 1, 2022. *See People v. Ware*, 14 Cal. 5th 151 (2022). The California Supreme Court reversed the judgment of the Court of Appeal with respect to Nicholas Hoskins only and remanded for further proceedings consistent with its opinion. *Id.* at 175.

Petitioner thereafter submitted a supplemental brief to the Court of Appeal on January 11, 2023, to address changes in the law, including Assembly Bill ("AB") 333 and the modifications to California Penal Code § 186.22. (ECF No. 38-18.) Petitioner argued that his gang-related enhancements must be reversed, and his sentence reconsidered, in light of the changes. (ECF No. 39-1 at 5.) On March 27, 2023, the Court of Appeal vacated its August 12, 2020, opinion and reissued the opinion with modification. (*Id.* at 5–6.) With respect to Petitioner, the Court of Appeal held as follows:

> As to appellant Simpson, we reverse his conviction on count 9[6] (gang conspiracy, § 182.5). On counts 1 through 5, we vacate the true findings on the gang enhancement allegations (§ 186.22, subd. (b)). On counts 2 and 3, we vacate the true findings on the gang-related firearm enhancement allegations (§ 12022.53, subds. (b)–(d) & (e)(1)). Simpson's sentence is vacated and the matter is remanded to the superior court. On remand, the court is directed to strike the unpaid balance of the $154 criminal justice fee and the People shall decide whether to retry Simpson for gang conspiracy, the gang enhancement allegations (§ 186.22, subd. (b)), and gang-related firearm enhancement allegations (§ 12022.53, subds. (b)–(d) & (e)(1)). Upon determination as to the status of count 9 and these allegations (no retrial, or

---

[6]    [footnote added] Petitioner was not convicted of gang conspiracy, Cal. Penal Code § 182.5, on Count 9, but on Count 6.

1
2
retrial and final resolution) Simpson is to be sentenced consistent with current law.  In all other respects, Simpson's judgment is affirmed.

3
(*Id.* at 79.)

4
5
6
On May 5, 2023, Petitioner filed a petition for review in the California Supreme Court.  (ECF No 39-2.)  The petition was summarily denied on June 21, 2023.  (ECF No. 39-3.)

7
**B.    Petitioner's State Habeas Petitions**

8
9
10
11
On June 27, 2022, Petitioner filed a petition for writ of habeas corpus in California Superior Court seeking resentencing relief pursuant to Senate Bill No. 775 and California Penal Code section 1170.95, which was renumbered to section 1172.6.  (ECF No. 39-5 at 2.)  The court denied the petition without prejudice.  (*Id.*)

12
13
14
15
On May 5, 2023, Petitioner filed another petition for writ of habeas corpus in California Superior Court.  (ECF No. 39-4.)  Petitioner argued ineffective assistance of counsel and prosecutorial misconduct.  (*Id.*)  The California Superior Court denied the petition on May 18, 2023.  (ECF No. 39-5.)

16
17
18
19
20
21
On August 14, 2023, Petitioner filed a petition for writ of habeas corpus in the Court of Appeal.  (ECF No. 39-6.)  Petitioner argued ineffective assistance of trial counsel and prosecutorial misconduct.  (*Id.*)  The Court of Appeal denied the petition in a written decision.  (ECF No. 39-7.)  The Court of Appeal found that the petition was procedurally barred as untimely, but even if it were timely, Petitioner was not entitled to relief on the merits.  (*Id.*)

22
23
24
25
On October 30, 2023, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, arguing ineffective assistance of trial counsel and prosecutorial misconduct.  (ECF No. 39-8.)  The California Supreme Court summarily denied the petition without citation.  (ECF No. 39-9.)

26
**C.    Petitioner's Federal Habeas Petitions**

27
28
On January 21, 2020, Petitioner filed his first federal petition for writ of habeas corpus.  (*Simpson v. Madden, et al.*, No. 20-cv-00146-WQH-KSC (S.D. Cal.), ECF No 1.)

The case was dismissed on May 14, 2020, because Petitioner failed to either pay the filing fee or seek to proceed *in forma pauperis*. (*Id.*, ECF No. 9.)

On October 12, 2021, Petitioner commenced the instant habeas corpus proceedings pursuant to 28 U.S.C. § 2254 by filing another petition for writ of habeas corpus. (ECF No. 1.) On October 14, 2021, the Court issued an order dismissing the case without prejudice because Petitioner failed to either pay the required filing fee or qualify to proceed *in forma pauperis*. (ECF No. 2.) Petitioner paid the filing fee on January 28, 2022. (ECF No. 6.)

On January 24, 2022, Petitioner filed a motion for stay and abeyance while he exhausted several of his claims in state court. (ECF No. 5.) On July 8, 2022, the Court granted Petitioner's motion and stayed the case. (ECF Nos. 14, 15.) On April 8, 2024, Petitioner filed a motion to lift the stay, reopen the case, and amend his petition, which was granted the same day. (ECF Nos. 26, 27.)

On April 30, 2024, Petitioner filed his verified first amended petition for writ of habeas corpus. (ECF No. 30.) On July 1, 2024, Respondent filed an answer and thereafter lodged the state court record. (ECF Nos. 34–39.) On July 29, 2024, Petitioner filed a traverse. (ECF No. 41.)

## III. STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

Pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal habeas courts are required to be "highly deferential" to state court decisions regarding a petitioner's federal claims. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citation and internal quotation marks omitted). Accordingly, when a state court has adjudicated a petitioner's federal claim on the merits, federal habeas relief may not be granted unless the state court's decision (1) "was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the [United States] Supreme Court . . . ," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Sexton v. Beaudreaux*, 585 U.S. 961, 964 (2018) (per curiam).

A state court's decision is "contrary to" clearly established federal law if the state court (1) "applies a rule different from the governing law set forth in [U.S. Supreme Court] cases," or (2) "decides a case differently than [the U.S. Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)); *see also* 28 U.S.C. § 2254(d)(1). An "unreasonable application" of clearly established federal law occurs where the state court "identifies the correct governing legal principle from [the U.S. Supreme Court's decisions] but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (quoting *Williams*, 529 U.S. at 413). "[A] federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." *Id.* at 75–76 (citations and internal quotation marks omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the U.S. Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. The AEDPA standard is intentionally difficult to meet, *Beaudreaux*, 585 U.S. at 965, and Petitioner has the burden of showing that federal habeas relief is warranted. *Pinholster*, 563 U.S. at 181.

In his Petition, Petitioner claims that he should be granted habeas relief on the following grounds: (1) he was denied his federal right to due process where the People failed to present sufficient evidence to sustain Petitioner's conviction for conspiracy in Count 1 (Claim One); (2) he was denied his federal right to due process where the jury was permitted to consider overt acts after the conspiracy terminated and overt acts that were not proven to support Count 1 (Claim Two); (3) he was denied his federal right to due process where the reading of CALCRIM 418 permitted the jury to convict Petitioner based

on a lesser burden of proof (Claim Three); (4) he was denied his federal right to due process where there was insufficient evidence to prove that Petitioner committed attempted murder in Counts 2 and 3 or assault with a semi-automatic firearm in Counts 4 and 5 (Claim Four); (5) he was denied his federal right to due process based on the cumulative prejudicial effect of the above errors (Claim Five); (6) he was denied his federal right to due process due to trial counsel's ineffective assistance of counsel (Claim Six); and (7) he was denied his federal right to due process due to prosecutorial misconduct (Claim Seven).  (Pet. at 15–18.)

Petitioner raised Claims One through Five[7] in a petition for review to the California Supreme Court, which denied his petition without comment or citation to authority.  (ECF Nos. 38-16, 38-17 at 7, 39-2, 39-3.)  The Court "look[s] through" the California Supreme Court's silent denial to the last reasoned decision, which is presumed to be the basis for the California Supreme Court's decision.  *Wilson v. Sellers*, 584 U.S. 122, 125 (2018); *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).  As that presumption has not been rebutted here, the Court will consider the Court of Appeal's reasoned opinion issued March 27, 2023 (ECF No. 39-1), rejecting Petitioner's claims on direct appeal, in addressing Claims One through Five, unless otherwise indicated.  *See Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010).

Petitioner raised Claims Six and Seven in a petition for review to the California Supreme Court, which denied his petition without comment or citation to authority.  (ECF Nos. 39-8, 39-9.)  Accordingly, the Court will "look through" the California Supreme Court's silent denial to the last reasoned decision, which is presumed to be the basis for the California Supreme Court's decision.  *Wilson*, 584 U.S. at 125; *Ylst*, 501 U.S. at 803–04. As that presumption has not been rebutted here, the Court will consider the Court of

---

[7] As discussed more fully below, Petitioner did not raise in the California Supreme Court his argument, under Claims One, Four, and Five, that gang evidence should have been bifurcated.

Appeal's reasoned opinion issued September 7, 2023 (ECF No. 39-7), rejecting Petitioner's claims on collateral review, in addressing Claims Six and Seven, unless otherwise indicated. *See Berghuis*, 560 U.S. at 380.

## IV.    DISCUSSION

Having independently reviewed the record, *Nasby v. McDaniel*, 853 F.3d 1049, 1052–53 (9th Cir. 2017), the undersigned finds no basis for federal habeas relief based on the state court's rejection of Petitioner's claims.  For ease of analysis, the Court addresses Petitioner's claims out of order.

### A.    Petitioner is Not Entitled to Federal Habeas Relief on His Insufficiency of Evidence Claims (Claims One and Four)

In Claim One, Petitioner argues that his federal right to due process under the Fifth, Sixth, and Fourteenth Amendments was violated because the People failed to present sufficient evidence to sustain his conviction for conspiracy (Count 1).  (ECF No. 30-1 at 14–21.)  In Claim Four, Petitioner argues that his federal right to due process under the Fifth, Sixth, and Fourteenth Amendments was violated because the People failed to present sufficient evidence to sustain his convictions for attempted murder (Counts 2 and 3) and assault with a semi-automatic firearm (Counts 4 and 5).  (*Id.* at 26–29.)

Respondent argues that Petitioner has failed to establish that the Court of Appeal unreasonably applied U.S. Supreme Court precedent or made an unreasonable determination of the facts on both claims.  (ECF No. 34-1 at 23–31, 39–42.)  The Court will address Petitioner's specific arguments on each count below.

#### 1.    Applicable Law

On habeas corpus, the court's inquiry into the sufficiency of evidence is limited in that it is subject to two layers of judicial deference.  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).  First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  *Id.* (quoting *Cavazos v. Smith*,

565 U.S. 1, 2 (2011) (per curiam)); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (standard of review on sufficiency of the evidence claim is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original)). "[T]he only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S. at 656. "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation and quotation marks omitted).

Second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Coleman*, 566 U.S. at 651 (citations and internal quotation marks omitted); *see Emery v. Clark*, 643 F.3d 1210, 1213–14 (9th Cir. 2011) (on federal habeas review, courts "ask only whether the state court's decision was contrary to or reflected an unreasonable application of *Jackson* to the facts of a particular case") (per curiam) (citation omitted). Sufficiency of the evidence claims are judged by the elements defined by state law. *Jackson*, 443 U.S. at 324 n.16.

### 2. Court of Appeal Decision

The Court of Appeal identified and applied the following law with respect to Petitioner's sufficiency of the evidence claims:

### I.     SUFFICIENCY OF EVIDENCE

#### A.     *General Legal Principles*

Where a defendant challenges the sufficiency of the evidence supporting a conviction, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Kraft* (2000) 23 Cal. 4th 978, 1053.) We presume in support of the judgment the existence of every fact the trier of

fact could reasonably deduce from the evidence. (*Ibid.*) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court[,] that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'"" (*Id.* at pp. 1053–1054.) Reversal for insufficient evidence is warranted only when it appears that under no hypothesis whatsoever is there sufficient evidence to support the jury's verdict. (*People v. Bolin* (1998) 18 Cal. 4th 297, 331.)

(ECF No. 39-1 at 19–20.)

        3.    <u>Analysis</u>

            a.    *Attempted Murder and Assault with a Semi-Automatic Firearm*

                i.    Arguments

In Claim Four, Petitioner argues there was insufficient evidence to prove attempted murder (Counts 2 and 3) and assault with a semi-automatic firearm (Counts 4 and 5). (ECF No. 30-1 at 26–29.) Specifically, Petitioner argues that there was insufficient evidence of attempted murder where intent can be found based upon the firing of a gun at a victim from close range, but where the evidence here was that the distance between the shooter and the target was approximately 15 to 30 feet. (*Id.* at 27.) Petitioner further argues that the jury could not rely on the testimony of Tiana Jasicki ("Jasicki"), who identified Petitioner as the shooter, because her testimony was unreliable, and she was not a disinterested witness. (*Id.*) Petitioner also argues that there was insufficient evidence to establish that Petitioner aided or abetted the attempted murder because the "only evidence the People presented of Petitioner's involvement in the altercation was Jasicki's testimony." (*Id.* at 28.)[8] Petitioner

---

     [8]     Although it was the People's position that Petitioner was the shooter, the jury was also instructed on an aiding and abetting theory. (*See* ECF Nos. 37-10 at 23; 37-13 at 26–27.)

contends that it was more likely than not that there was a lone shooter apart from his group and argues that gang membership alone is insufficient to establish the requisite criminal intent. (*Id.* at 28–29.) Lastly, Petitioner argues that he could not be guilty of aiding and abetting the assaults for the same reason he could not be guilty of aiding and abetting the attempted murder. (*Id.* at 29.)

Respondent argues that Petitioner is not entitled to relief because the Court of Appeal did not contradict or unreasonably apply U.S. Supreme Court precedent in rejecting the argument on direct review. (ECF No. 34-1 at 39–42.) Respondent argues that the evidence was sufficient to enable a rational jury to find, beyond a reasonable doubt, that Petitioner fired a gun at a group of people and in doing so committed attempted murder as well as assault with a semiautomatic firearm. (*Id.* at 42.)

ii.    Court of Appeal Decision

Petitioner's convictions on these counts arise from the June 14, 2011 shooting. (ECF No. 39-1 at 2.) The Court of Appeal decision summarizes the factual background of this shooting as follows:

> *June 14, 2011 - Simpson's Attempted Murder and Assault with Firearm Convictions (Counts 2-5)*
>
> On this day a group of five men, including Simpson, Orchord, Paris, and Chavarry started arguing with two Crips gang members on a street corner. Paris and Orchord began throwing gang signs with their hands. As the two Crips started to walk away, Simpson pulled out a gun, someone said "Fuck Crabs" and Simpson fired two or three shots. The two rival gang members fled. Simpson gave the gun to Orchord, who subsequently hid it in his garage.
>
> After learning that the suspect group might be inside Orchord's apartment, police officers went to the apartment where they eventually contacted Orchord and Paris. Officers later found Simpson and Lucas hiding in the attic and Chavarry hiding under some clothing. Officers found a loaded revolver about a foot from where Simpson had been hiding.
>
> Officers who responded to the scene located two expended .45-caliber shell casings in the front yard of a residence, and a bullet further down the street. During a search of Orchord's residence officers found a loaded .45-

caliber semiautomatic firearm hidden in the garage.  Subsequent ballistics tests linked this firearm to the shooting.

Police placed Simpson and Lucas in the back of a patrol car and the prosecution played their recorded conversation for the jury.  The gang expert also interpreted some of the conversation.  When Lucas commented that the police have not "found the other one," Simpson told him to shut up and explained to him why the police put them in the back of a patrol car together.  This was an example of an older gang member schooling a younger one on police investigations.

When Lucas said, "they found the second one," Simpson's commented, "On Brims," asking Lucas to swear on the gang that police had found both guns.  The gang expert interpreted Simpson's reply, "I got life," as an admission that he knew a gun would be linked to a shooting and there may be evidence connecting him to the shooting.  Simpson and Lucas also discussed who would take the responsibility for the gun, with Simpson telling Lucas that he should accept the charge and take the hit for the gang because he was the youngest.

The garage contained Brim gang graffiti that included the gang monikers for Paris, Johnson, Chavarry, Hoskins, Orchord, Ware, and Peavy.  The graffiti referenced "CK" meaning "Crip Killing" and "crab" which is a derogatory term for a Crips gang member.

(ECF No. 39-1 at 8–9.)

The Court of Appeal rejected Petitioner's challenge to the sufficiency of the evidence as to Counts 2 through 5, reasoning as follows:

Simpson challenges the sufficiency of the evidence supporting his convictions for attempted murder (counts 2 and 3) and assault with a semiautomatic firearm (counts 4 and 5) arising from the June 14, 2011 shooting.  He claims the evidence does not establish that he was the shooter and intended to kill, or that he aided and abetted the shooting.  Specifically, he argues that T.J., an accomplice and admitted liar, was the only witness to identify him as the shooter, claiming that all other witnesses gave differing descriptions of the shooter.

Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  (*People v. Ervine* (2009) 47 Cal. 4th 745, 785.)  Attempted murder

also requires express malice, meaning the assailant desires the victim's death or knows to a substantial certainty that the victim's death will occur. (*People v. Booker* (2011) 51 Cal. 4th 141, 178.) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.'" (*People v. Smith* (2005) 37 Cal. 4th 733, 739.) Intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*Id.* at p. 741.) "The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill." (*People v. Houston* (2012) 54 Cal. 4th 1186, 1218.) The circumstance that the bullet misses its mark or fails to prove lethal is not dispositive. (*Smith*, at pp. 741–742.) Attempted murder does not necessarily require a specific target and an indiscriminate would-be killer who fires into a crowd is just as culpable as one who targets a specific victim. (*Houston*, at p. 1218.)

To support a conviction, accomplice testimony must be corroborated by independent evidence which, without aid or assistance from the accomplice's testimony, tends to connect the defendant with the crime charged. (*People v. Szeto* (1981) 29 Cal. 3d 20, 27.) "'Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth."'" (*People v. Manibusan* (2013) 58 Cal. 4th 40, 95.) "'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.'" (*People v. Romero and Self* (2015) 62 Cal. 4th 1, 32–33.)

We are satisfied that substantial evidence supports Simpson's attempted murder and assault convictions. T.J. admitted that on the day of the shooting she lied when she told an officer that she had not seen anything. During her police interview, which took place three years before she entered witness protection, T.J. identified Simpson as the shooter. She claimed that Orchord was in the bathroom during the shooting and that he ran outside after the shooting. During trial, T.J. similarly stated that Simpson was the shooter, that Orchord was in the bathroom during the shooting and that he ran outside after the shooting.

Assuming the jury found T.J. was an accomplice, the testimony of other witnesses sufficiently corroborated T.J.'s testimony that Simpson was the shooter.  Brenda, a neighbor who knew Orchord, also testified that Orchord was not outside during the initial argument.  After the shooting, T.J. saw Simpson give the gun to Orchord who then hid the gun inside the garage.  Police found a firearm in the garage and ballistics testing linked this firearm to the shooting.

The witnesses who observed the altercation on the street testified inconsistently regarding the physical appearance of the shooter.  We examined this testimony in depth and focused on the consistencies in the testimony, which described a person meeting Simpson's physical description.

A police officer who was patrolling the area 30 minutes before the shooting saw Paris and Simpson hanging out with a group of Brim gang members in front of Orchord's garage.  All the men wore blue jeans and T-shirts, including Simpson who wore a white T-shirt.  The officer stated that Simpson did not have a full beard and described him as about 180 to 190 pounds with short black hair.  Raymond, a school worker, heard the argument.  He heard the shooter say "fuck that, fuck that" followed by two gunshots.  After the shooting and at trial, he described the shooter as an African-American man in his 20's with a muscular build.

Maritza, a neighbor, also heard the argument.  She described the shooter on the day of the incident as about 5 feet 10 inches tall and weighs 220 pounds with a full beard.  Police photographed Paris, Orchord, Chavarry, Lucas, and Simpson after the shooting.  While Paris, Orchord, Chavarry, Lucas were relatively clean shaven, Simpson had sufficient stubble on his face to be construed as a full beard.

Carlos, a construction worker, heard the argument.  He described the shooter as about 5 feet 10 inches or 5 feet 11 inches tall and weighing about 220 to 230 pounds.  He did not mention the shooter's hairstyle to the officer.  Elizabeth, another school worker, looked outside her second floor window after hearing the argument and described the shooter as an African-American man in his mid-20's, with very short hair, about 5 feet 7 inches or 5 feet 8 inches.  She later described the shooter as being tall.

On the day of the shooting, Simpson had short hair.  One officer who observed the Brim gang members after their arrests described Simpson as the largest and "[d]efinitely the most muscular" of the group.  This officer described Lucas, who also had short hair, as about 5 feet 7 inches tall and 160 pounds.  He described Paris and Orchord as being about the same height as

Lucas, with Orchord having a medium build, while Paris was thinner than Lucas and had his hair in braids. Although police detected no gunshot residue on Simpson after his arrest, Simpson had sufficient time to change clothes and thus had sufficient time to wash his hands.

T.J.'s corroborated testimony supported the verdicts against Simpson on the attempted murder and assault charges. (*In re Frederick G.* (1979) 96 Cal. App. 3d 353, 366 [testimony of a single witness may support a judgment, "even if it is contradicted by other evidence, inconsistent or false as to other portions."].) Additionally, the testimony of the other eyewitnesses suggests that Simpson, the largest man of the group, was the shooter. "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal. 4th 342, 403.)[9]

(ECF No. 39-1 at 38–42.)

### iii.    Elements of Crime

Under California law, attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. *People v. Ervine*, 47 Cal. 4th 745, 785 (2009). Attempted murder also requires express malice, meaning the assailant desires the victim's death or knows to a substantial certainty that the victim's death will occur. *People v. Booker*, 51 Cal. 4th 141, 178 (2011). "Intent

_____

[9]    [footnote in original] In a passing argument, Simpson claims the evidence does not support the finding that he intended to kill the victims because the shooting did not take place from close range. We are not persuaded by this argument.

One witness described the distance between the two groups as "30 feet max." Another witness described the distance between the shooter and his intended targets as 15 to 20 feet. "'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ."'" (*Smith*, *supra*, 37 Cal. 4th at p. 741.) "'[T]he crime of attempted murder requires no physical injury to the victim . . . .'" (*People v. Bland* (2002) 28 Cal. 4th 313, 328–329.) Moreover, these same two witnesses described the victims as retreating. "[F]iring at a fleeing victim reasonably reflects an intention to kill." (*People v. Bolin* (1998) 18 Cal. 4th 297, 319.)

to unlawfully kill and express malice are, in essence, one and the same." *People v. Smith*, 37 Cal. 4th 733, 739 (2005) (internal quotation marks and citation omitted). Intent to kill may be inferred from the defendant's acts and the circumstances of the crime. *Id.* at 741.

The crime of assault with a semiautomatic firearm under California law provides that "[a]ny person who commits an assault upon the person of another with a semiautomatic firearm shall be punished by imprisonment in the state prison for three, six, or nine years." Cal. Penal Code § 245(b). "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Cal. Penal Code § 240; *see also People v. Rocha*, 3 Cal. 3d 893, 899 (1971) ("An assault is an unlawful attempt, coupled with the present ability, to commit a violent injury on the person of another, or in other words, it is an attempt to commit a battery.") (citations omitted).

### iv.    Analysis

The Court of Appeal's rejection of this claim was not objectively unreasonable. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Petitioner was guilty of attempted murder and assault with a semi-automatic firearm. As detailed by the Court of Appeal, such a finding was warranted from the evidence of Petitioner's actions and all of the circumstances surrounding the shooting.

The evidence supports the jury's finding that Petitioner had the specific intent to kill and committed a direct but ineffectual act towards accomplishing the intended killing. *See Ervine*, 47 Cal. 4th at 785. The evidence further supports the jury's finding that Petitioner committed assault with a semi-automatic firearm. *See Rocha*, 3 Cal. 3d at 899. Specifically, the evidence presented at trial included the following: On June 14, 2011, around 10:15 a.m., Petitioner was observed by a police officer on patrol hanging out with several males, including Paris, and one female, in front of the southernmost garage at 3228 44th Street. (ECF No. 36-13 at 27–30; *see also* ECF No. 36-9 at 47.) At the time, Petitioner was described as approximately 180 to 190 pounds, wearing a white t-shirt and blue jeans, and having short black hair. (ECF No. 36-13 at 30–31.) He did not have a full beard, but

he did have some facial hair in the form of a light mustache and hair on his chin and on the sides of his chin.  (*Id.* at 41, 51.)

The shooting occurred around 10:45 a.m.  (ECF No. 36-9 at 44.)  One witness heard "a confrontation or an argument or loud voices" and observed two groups of people—one group of five and another group of two—approaching each other who were "[p]robably 30 feet max" apart as they were arguing and then the witness heard two gunshots as the group of five moved behind a truck.  (*Id.* at 160–64.)  The group of five individuals were described as young Black males, early to mid-20s, who were casually dressed.  (*Id.* at 163.)  The group of two were believed to be white or Hispanic.  (*Id.*)  The group of five were the aggressors and using a lot of gang hand signs.  (*Id.* at 164, 170.)  One member of the group of two was trying to diffuse the situation and get his friend out of the confrontation.  (*Id.* at 164, 171–72.)  The two males were basically retreating and one of them said, "Come on. Let's get out of here."  (ECF No. 36-13 at 32.)  After the gunshots, the group of two very quickly moved out of the area.  (ECF No. 36-9 at 165–66.)  The group of five then walked back down the street into an apartment driveway area near 44th Street and Thorn Street. (*Id.* at 166–67; *see also* ECF No. 36-13 at 32.)

Another witness saw a group of Black males near the corner of 44th Street and Thorn Street and he saw one Black male walking towards him with a silver gun in his right hand down by his right leg.  (ECF No. 36-11 at 17–18.)  The witness then saw the Black male lift his right hand and fire twice up the street.  (*Id.* at 18.)  After he fired the gun, the Black male turned and ran back down the street.  (*Id.*)  The witness described the shooter as a Black male around 5'10", 5'11", 220 to 230 pounds wearing a white short-sleeved t-shirt with some kind of black logo on the back and dark blue pants.  (*Id.*)

Another witness similarly saw a group of Black males arguing with two white males. (*Id.* at 15.)  The witness saw the group of Black males following the white males and as the white males kept walking, the group of Black males fell back and then one Black male walked in front of the others, holding a chrome-colored gun in his left hand next to his left leg.  (*Id.* at 15–16.)  The witness then went back into her house and heard gunshots.  (*Id.* at

28

16.)  The witness stated that the shooter was a Black male approximately 5'10", 220 pounds, with full beard, and was wearing a white t-shirt and light blue pants.  (*Id.*)

Another witness heard gunshots and then saw a Black male around "15 to 20 feet" from a group tuck a gun into his pants.  (ECF No. 36-10 at 52–57.)  The male was in his early to mid-20s, wearing a white shirt and jeans, and had very short hair.  (*Id.*)  The male was around 5'7" or 5'8".  (*Id.*)  The man quickly walked away and into a brown apartment complex near 44th Street and Thorn Street.  (*Id.*)

Another witness heard "shouting and [an] exchange of words."  (ECF No. 36-9 at 177–79.)  He saw a bigger Black male in his 20s wearing a white t-shirt and jeans, say "Fuck that, fuck that," followed by two gunshots.  (*Id.* at 179–80.)  He observed two groups and one group ran back into the second apartment complex from the corner of 44th Street and Thorn Street after the shooting.  (*Id.* at 180–81.)

Another witness, who was inside her house on 44th Street on the day of the shooting, saw two people "throwing up gang signs and stuff like that across the street" and "screaming a bunch of stuff" at another group she did not see.  (ECF No. 36-10 at 16–18.)  She saw "their hands going up and calling each other Bloods and stuff like that."  (*Id.* at 17–18.)  She stated that she did not know either individual, but one was wearing a red shirt and the other a blue shirt.  (*Id.* at 21–22.)  A police officer later testified that, during a lineup, the same witness identified Paris as the individual in the blue shirt.  (*Id.* at 41.)  She described him as the skinny guy with the braids, wearing a blue basketball jersey and a white and blue glove.  (*Id.*)  She also identified Orchord as the other individual who was arguing, calling him the "big guy with no shirt," but stated that when this happened, he had a red t-shirt on.  (*Id.* at 41–42.)  The witness knew "Demarcus Branch" (aka Chavarry) but stated that he was not there.  (*Id.* at 42–43.)  Petitioner was not in the lineup.  (*Id.* at 46.)

The police were called around 10:48 a.m.  (ECF No. 36-9 at 79.)  The police went into the apartment complex located at 3228 44th Street about 11:25 a.m.  (*Id.* at 46, 80.)  The apartment complex was approximately one hundred feet from the scene.  (*Id.* at 80.)  Orchord and Paris came out of the apartment and surrendered before the police went in.

(*Id.* at 80–82.)    Around 12:48 p.m., the police found Chavarry/Branch hiding in the apartment under clothing in a closet.  (*Id.* at 63–64.)  Around three hours after shots had been fired, Petitioner was located by the police in the attic of the apartment, along with Lucas.  (ECF Nos. 36-9 at 68–73; 36-11 at 36–41; 36-13 at 33–36.)  At the time he was located, Petitioner was no longer wearing a white t-shirt and jeans.  (ECF No. 36-13 at 37.)  He was wearing shorts and no shirt.  (ECF No. 36-9 at 72.)  The police recovered a .38 caliber loaded revolver by the entrance to the attic, wrapped in a red bandanna.  (*Id.* at 73–74.)  The police recovered a second firearm, a cocked .45 caliber 1911 style pistol, inside a broken piece of drywall in the garage on 3228 44th Street.  (*Id.* at 76–78, 193–95.)  The firearm was wrapped in a white t-shirt.  (*Id.* at 195.)  At least one witness saw the shooter go into the garage where the firearm was found after the shooting.  (*Id.* at 196–97.)

After Petitioner and Lucas were found in the attic and arrested, they were placed in the back of a patrol car with a recording device.  (ECF No. 36-9 at 204.)  As detailed by the Court of Appeal:

> Police placed Simpson and Lucas in the back of a patrol car and the prosecution played their recorded conversation for the jury.  The gang expert also interpreted some of the conversation.  When Lucas commented that the police have not "found the other one," Simpson told him to shut up and explained to him why the police put them in the back of a patrol car together.  This was an example of an older gang member schooling a younger one on police investigations.

> When Lucas said, "they found the second one," Simpson commented, "On Brims," asking Lucas to swear on the gang that police had found both guns.  The gang expert interpreted Simpson's reply, "I got life," as an admission that he knew a gun would be linked to a shooting and there may be evidence connecting him to the shooting.  Simpson and Lucas also discussed who would take the responsibility for the gun, with Simpson telling Lucas that he should accept the charge and take the hit for the gang because he was the youngest.

> The garage contained Brim gang graffiti that included the gang monikers for Paris, Johnson, Chavarry, Hoskins, Orchord, Ware, and Peavy.

21-cv-01763-CAB-JLB

The graffiti referenced "CK" meaning "Crip Killing" and "crab" which is a derogatory term for a Crips gang member.

(ECF No. 39-1 at 8–9.)

Two casings were found at the scene belonging to a .45 caliber pistol. (ECF No. 36-11 at 20, 32–34; *see also* ECF No. 36-9 at 62–63.) The San Diego Police Department crime lab firearms section matched the casings recovered from the scene to the .45 caliber pistol found in the apartment. (ECF No. 36-10 at 75–90.) DNA analysis could not get any results on the semiautomatic because it was too complex, but the analyst was able to exclude Petitioner as a major contributor on the revolver. (*Id.* at 106.)

Two witnesses identified Orchord and Paris as being part of the group of Black males, but not the shooter. (*See* ECF Nos. 36-13 at 45–51; 36-10 at 41–43.) Petitioner was not included in the line-up presented to these witnesses. (*See* ECF Nos. 36-13 at 46; 36-10 at 42–47.) Other witnesses did not identify Petitioner as the shooter when he was in the lineup, but on at least one occasion he was not wearing a white t-shirt and blue jeans. (*See* ECF Nos. 36-13 at 48–49; 36-11 at 29–31.)

Jasicki specifically testified that at the time of the shooting she was staying with Orchord, who is her baby's father. (ECF No. 36-10 at 116–17.) Jasicki testified that Orchord was in the Brims gang and he was fighting every day around the time of the shooting with the Crips. (*Id.* at 118–22.) The day before the shooting, Orchord purchased a revolver from a tweaker. (*Id.*) That night, Petitioner and others showed up at Orchord's house. (*Id.* at 122–23.) The following day, Petitioner and others returned to Orchord's house. (*Id.* at 124.)

She testified that the morning of the shooting, Petitioner and others were hanging out in front of the apartment complex by the driveway. (*Id.* at 126.) She further testified that she saw some Crips walking up the street. (*Id.* at 128.) Petitioner and his friends exchanged words with the Crips and started arguing and throwing up gang hand signs. (*Id.* at 129, 138.) Jasicki heard someone with Petitioner say, "Fuck Crabs," which meant that there was going to be a fight. (*Id.* at 130–31, 139.) Jasicki testified that Petitioner and his

21-cv-01763-CAB-JLB

friends ran towards the Crips, then Petitioner fired two or three shots. (*Id.* at 133, 141, 144, 166, 174–75.) At the time the gun was fired, Orchord was in the bathroom. (*Id.* at 130.) He ran out as the shots were fired. (*Id.* at 133.) Jasicki watched Petitioner give Orchord the gun in the street and then Orchord hid the gun in the garage. (*Id.* at 133–36.) The gun that Petitioner gave him was not the revolver that Orchord and Jasicki had purchased. (*Id.* at 135.) Petitioner and his friends ran into the apartment. (*Id.* at 136.) Jasicki testified that she thought they were all probably wearing "501s." (*Id.* at 137.)

On the day of the shooting, a police lieutenant who observed Petitioner and his friends described Lucas as a teenager, maybe 5'7", 160 pounds. (ECF No. 36-9 at 78.) He described Paris as someone in his late teens, with the same build, but maybe a little thinner. (*Id.*) He described Orchord as the oldest of the teenagers, around 18, the same height, a little but thicker but still kind of thinner in appearance. (*Id.*) He further described Petitioner as around 21 at the time, physically the largest of the group and definitely the most muscular. (*Id.*)

Petitioner first argues the above evidence was insufficient to support a finding of intent to kill because the shots were not fired at sufficiently close range to support the inference of intent. (ECF No. 30-1 at 27.) The Court of Appeal rejected this argument, noting that two witnesses described the distance between shooter and victims as no more than thirty feet. (ECF No. 39-1 at 42 n.16.) Under California law, "[t]he act of firing toward a victim at a close, but not point blank, range in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill." *Smith*, 37 Cal. 4th at 741 (internal quotation marks and citation omitted); *see also People v. Houston*, 54 Cal. 4th 1186, 1218 (2012). The crime "requires no physical injury to the victim." *People v. Bland*, 28 Cal. 4th 313, 328–29 (2002) (citation omitted); *see also Smith*, 37 Cal. 4th at 741–42. In addition, the Court of Appeal noted that the same two witnesses described the victims as retreating. (ECF No. 39-1 at 42 n.16.) "[F]iring at a fleeing victim reasonably reflects an intention to kill." *People v. Bolin*, 18 Cal. 4th 297, 319 (1998), *as modified on denial of reh'g* (Aug. 12, 1998) (citation omitted). Given the

foregoing, the Court finds that the Court of Appeal reasonably determined that a rational trier of fact could have found that Petitioner had the intent to kill under California law.

Next, Petitioner argues that Jasicki's testimony that Petitioner was the shooter was unreliable, as she was not a disinterested witness. (ECF No. 30-1 at 27.) Petitioner points to evidence that Jasicki was the paramour of Orchord, sought to protect Orchord, received money from the government in exchange for testifying, was arrested for prostitution, and had a history of untruthfulness. (*Id.*) He further argues that she was an accomplice and alleged coparticipant and the evidence adduced at trial does not support Jasicki's testimony. (*Id.*) In its analysis, the Court of Appeal focused on all the evidence that corroborated Jasicki's testimony. (ECF No. 39-1 at 39–42.) The Court of Appeal found that, even assuming Jasicki was an accomplice, the testimony of other witnesses sufficiently corroborated her testimony that Petitioner was the shooter.[10] (*Id.* at 40.) Although the witnesses testified inconsistently regarding the physical appearance of the shooter, the

---

[10]    The trial court instructed the jury that before they considered the testimony of Jasicki as evidence against Petitioner regarding the crimes in the case, it must first decide whether Jasicki was an accomplice to those crimes. (ECF No. 37-13 at 21.) Under California law, an "accomplice" is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." *People v. Manibusan*, 58 Cal. 4th 40, 93 (2013) (citation omitted). To support a conviction, accomplice testimony must be corroborated by independent evidence which, without aid or assistance from the accomplice's testimony, tends to connect the defendant with the crime charged. *People v. Szeto*, 29 Cal. 3d 20, 27 (1981). "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. It is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." *Manibusan*, 58 Cal. 4th at 95 (internal citations and quotation marks omitted). "The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime." *People v. Romero & Self*, 62 Cal. 4th 1, 32–33 (2015), *as modified on denial of reh'g* (Oct. 14, 2015) (citation omitted).

Court of Appeal focused on the consistencies, which described a person meeting Petitioner's physical description—beard, short hair, and muscular. (*Id.* at 40–41.) The Court also focused on the fact Jasicki's statement three years before she testified was largely consistent with her testimony during trial. (*Id.* at 39.) Based on this Court's review of the evidence, the Court of Appeal reasonably determined that a rational trier of fact could have found that Jasicki's corroborated testimony supported the verdict against Petitioner on the attempted murder and assault charges. (*Id.* at 41.)

Moreover, as discussed in detail below, Petitioner had an opportunity to cross-examine Jasicki on the stand and attack her credibility as a witness. A reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Walters*, 45 F.3d at 1358 (citation omitted); *see also Smith*, 565 U.S. at 7.[11]

Based on the foregoing, the Court of Appeal's decision was neither contrary to, nor involved an unreasonable application of, the *Jackson* standard. Nor was it based on an unreasonable determination of the facts in light of the evidence presented. Petitioner is not entitled to habeas relief on this claim.

### b. *Conspiracy*

#### i. Arguments

In Claim One, Petitioner challenges his conspiracy to commit murder conviction on the basis that the People's evidence was insufficient. (ECF No. 30-1 at 14–21.) Specifically, Petitioner argues that the People attempted to prove that Petitioner engaged in a conspiracy by solely offering gang evidence, and gang evidence, in and of itself, is

---

[11]    Petitioner further argues that the prosecution impermissibly relied on gang evidence to establish the requisite criminal intent. (ECF No. 30-1 at 28–29.) As set forth in detail below when addressing AB 333, the Court finds that this argument is both unexhausted and not colorable.

insufficient to demonstrate substantive criminal intent. (*Id.* at 19–20.) Petitioner further argues that the People failed to connect him to the social media posts that were offered as evidence of the conspiracy or to any of the eighteen shootings offered to prove the count. (*Id.* at 20.) Even if the People had presented evidence that Petitioner entered into an agreement, Petitioner argues, he was only identified in two of the 104 overt acts, two overt acts took place outside the duration of the conspiracy, and he was in custody during seventy[12] of the overt acts. (*Id.*) Lastly, Petitioner argues that Adrianna P.'s testimony was devoid of evidentiary weight. (*Id.* at 21.) In response, Respondent argues that the Court of Appeal did not unreasonably apply *Jackson* to the facts of this case and there was no basis to find the court's factual findings were objectively unreasonable. (ECF No. 34-1 at 23–31.)

ii.    Court of Appeal Decision

The Court of Appeal addressed Petitioner's insufficiency of the evidence argument on his conspiracy conviction, as follows:

B.    *Conspiracy to Commit Murder (Count 1)*

1.    Conspiracy Legal Principles

"The law of conspiracy . . . permit[s] the imposition of criminal sanctions for [an] agreement alone, plus an overt act in pursuit of it, regardless of whether the crime agreed upon actually is committed." (*United States v. Feola* (1975) 420 U.S. 671, 694.) A conspiracy conviction "requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal. 4th 403, 416.)

---

[12]    Before the Court of Appeal, Petitioner argued he was in custody for 69 of the overt acts. (ECF No. 38-9 at 73.) Whether the number is 69 or 70 is not material to this analysis.

"It is seldom possible for the prosecution to offer direct evidence of an agreement to commit a crime. The agreement to commit the crime is usually made in secrecy. The conspiracy must be inferred by the trier of fact from all the circumstances that are proven, and if the inference is a reasonable one it will not be disturbed on appeal." (*People v. Chavez* (1962) 208 Cal. App. 2d 248, 253.) "Common design is the essence of a conspiracy and the crime can be committed whether the parties comprehend its entire scope, whether they act in separate groups or together, by the same or different means known or unknown to them, if their actions are consistently leading to the same unlawful result . . . ." (*People v. Means* (1960) 179 Cal. App. 2d 72, 80.) Evidence is sufficient to prove an agreement "'"if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy."'" (*People v. Maciel* (2013) 57 Cal. 4th 482, 515–516 (*Maciel*).) Each member of the conspiracy is liable for the acts of other members in carrying out the common purpose of the conspiracy. (*In re Hardy* (2007) 41 Cal. 4th 977, 1025.)

"While mere association does not prove a criminal conspiracy [citation], common gang membership may be part of circumstantial evidence supporting the inference of a conspiracy." (*People v. Superior Court (Quinteros)* (1993) 13 Cal. App. 4th 12, 20 (*Quinteros*).) Where "the evidence establishes that a particular gang has a specific illegal objective . . . evidence of gang membership may help to link gang members to that objective." (*United States v. Garcia* (9th Cir. 1998) 151 F.3d 1243, 1247 (*Garcia*).)

"Other than the agreement, the only act required is an overt act by any of the conspirators, not necessarily the defendant, and that overt act need not itself be criminal." (*People v. Smith* (2014) 60 Cal. 4th 603, 616.) "'[A]n overt act is an outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime.'" (*People v. Zamora* (1976) 18 Cal. 3d 538, 549, fn. 8.) "The purpose of the overt act is simply to show that the agreement has proceeded beyond the meeting of the minds stage to some direct or physical act, however innocent in itself, tending toward the furtherance of the objective of the conspiracy." (*People v. Saugstad* (1962) 203 Cal. App. 2d 536, 549–550.) A conspiracy conviction can rest on a single overt act. (*People v. Jurado* (2006) 38 Cal. 4th 72, 122 (Jurado).)

2.    Analysis

a.    General introduction

The amended information alleged that appellants conspired, "[o]n or about and between January 1, 2012 and April 23, 2014" with each other and other unknown persons to commit murder. Police identified 18 other Brim gang members, who were also Hit Squad members as coconspirators. The amended information alleged the commission of 104 overt acts in furtherance of the conspiracy. The object of the conspiracy was to kill suspected rival NC and WCC gang members.

The jury convicted appellants of conspiracy to commit murder. It is undisputed that the prosecution relied exclusively on circumstantial evidence and presented no direct evidence of a conspiracy to commit murder.

Simpson and Ware challenge their convictions, generally contending that the prosecution presented insufficient evidence showing they entered into any agreement to commit murder, claiming their guilt was based on their gang membership and virtually nothing else. Simpson and Ware claim that the evidence did not show they possessed the specific intent to commit murder. Simpson also asserts that his conspiracy conviction must be reversed because the jury was allowed to consider overt acts after the conspiracy terminated, and overt acts that the prosecution failed to prove. Finally, Simpson argues that his conspiracy conviction violated his free speech rights under the First Amendment and the California Constitution.

b.    Existence of and participation in a conspiracy

We have examined the entire record in the light most favorable to the judgment, including the relationship, interests, conduct and activities of the alleged conspirators and coconspirators before and during the alleged conspiracy. (*Maciel, supra*, 57 Cal. 4th at pp. 515–516.) We conclude that the record supports the reasonable inference that Simpson and Ware and their coconspirators tacitly came to a mutual understanding to murder rival NC and WCC gang members and that they participated in the conspiracy.

The prosecution gang expert was the detective investigating Brim from October 2011 through October 2015. At any given time, Brim had between 200 and 220 members. Simpson and Ware and their coconspirators were Brim gang members, and members of a Brim subset known as the Hit Squad. A "hit" means to kill someone. Some of the primary activities of Brim included murder and assaults with firearms.

The main rivals of the Brims are the Crips, specifically NC and WCC. In 2011, Peppers's murder sparked a gang war between Brim and WCC. Simpson and Ware knew Peppers.  In June 2011, about two months after Peppers's death, Simpson shot at two Crips gang members and was subsequently convicted of two counts each of attempted murder and assault with a firearm.[13]  With Simpson during the shooting were coconspirators Paris, Chavarry, and Lucas.  Paris pleaded guilty to aiding and abetting this shooting.

Simpson argues that the June 2011 shooting cannot be considered as evidence of a conspiracy because the prosecution did not allege the shooting as an overt act and the shooting preceded the alleged start date for the conspiracy.  Simpson is wrong.  Incidents occurring before the start of the conspiracy may be considered as circumstantial evidence supporting the existence of the conspiracy.  (*Maciel, supra*, 57 Cal. 4th at pp. 515–516.) Notably, sometime between the date of the June shooting and February 2012, Simpson got "CK" or "Crip Killer" tattoos on his elbows.

After Adrianna's arrest in May 2012, her statements to police provided further circumstantial evidence from which the jury could infer the existence of a conspiracy to commit murder.[14]  Namely, she stated that Simpson placed a gun in her purse, everybody looked up to Simpson, that he got all the guns and passed the guns to lots of people including, coconspirators Norman Sanchez, Lucas, and Paris.[15]  Coconspirators Norman Sanchez and Lucas

---

[13]    [footnote in original] As discussed *post*, the evidence supports these convictions. (*Post*, pt. I.D.)

[14]    [footnote in original] Simpson's focus on Adrianna's trial testimony where she recanted her earlier statements to police is misplaced because we may not reweigh the evidence or substitute our own assessment of the witnesses' credibility for the determination made by the jury. (*People v. Snow* (2003) 30 Cal. 4th 43, 66.)

[15]    [footnote in original] We reject Simpson's contention that Adrianna's testimony regarding putting the gun in her purse cannot be considered because it is uncorroborated accomplice testimony.  The instructions required jurors to decide whether Adrianna was an accomplice to the crimes alleged against appellants.  Assuming the jury found Adrianna was an accomplice, the testimony that Simpson put a gun in her purse, evidence that goes to the existence of the conspiracy, need not be corroborated.  (*People v. Cooks* (1983) 141 Cal. App. 3d 224, 312 (*Cooks*); *People v. Buono* (1961) 191 Cal. App. 2d 203, 215–216, fn. omitted ["[T]he corroboration required by Penal Code section 1111 does not include the corpus delicti and is confined to the matter of connection of the individual defendant with the crime."].)

pleaded guilty to the April 4, 2012 attempted murder of NC gang member, T.L. (overt acts nos. 7-11)[.] Coconspirator Timothy Hurst was convicted of the August 2013 attempted murder of B.T., a Lincoln Park gang member who was walking in WCC territory (overt acts nos. 38-42). Although B.T. was not a rival Crips gang member, the gang expert stated that this shooting was consistent with a hunting mission looking for a potential rival, but the person shot at was not a rival. The jury convicted Ware of attempting to murder a WCC gang member in March 2014 based on his participation in this shooting (overt acts nos. 76-81). Ware's moniker, CK (Crip Killer) Vick, evidenced his motive to kill rival Crips gang members.

This evidence amply supported the jury's finding that Simpson and Ware and their coconspirators entered into a tacit agreement to murder rival NC or WCC gang members. This evidence also established Simpson and Ware's participation in the conspiracy and their attempted murder convictions show that they harbored an intent to kill. (*People v. Lee* (2003) 31 Cal. 4th 613, 623–624 [attempted murder "requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing" and an aider and abettor must share the specific intent of the direct perpetrator].) The overt act requirement is also satisfied by Simpson's and Ware's convictions of attempted murder.[16]

c.    Overt acts after conspiracy ended or not proven

Simpson alleges that his conspiracy convictions must be reversed because the court allowed the jury to consider overt acts 15, 44, 103, and 104 which were not proved or occurred after the conspiracy terminated. He claims

---

[16]    [footnote in original] Simpson notes that only two of the 104 overt acts named him, and out of the remaining 100 overt acts, he was in custody for 69 of them, he was not depicted in photographs or involved in any of the social media messages, and there was no evidence he knew or was aware of the social media posts. These points are not persuasive because a conspirator need not personally participate in any of the overt acts as long as he or she conspired to commit the crime and a coconspirator committed an overt act. (*People v. Morante* (1999) 20 Cal. 4th 403, 417.) Moreover, "[a]lthough a defendant's arrest and incarceration may terminate his participation in an alleged conspiracy, his arrest does not terminate, or constitute a withdrawal from, the conspiracy as a matter of law." (*Cooks*, supra, 141 Cal. App. 3d at p. 316.) Rather, "[o]nce the defendant's participation in the conspiracy is shown, it will be presumed to continue unless he is able to prove, as a matter of defense, that he effectively withdrew from the conspiracy." (*Ibid.*) Simpson failed to make such a showing.

that the jury could have based the conspiracy convictions on one of the improperly included overt acts because the verdict form did not require that the jury reveal which overt act they found had been committed and there was no requirement that the jury unanimously agree on the same overt act to support a conspiracy conviction.  (*People v. Valdez* (2012) 55 Cal. 4th 82, 154, fn. 40.)  The People argue that any error in presenting these four overt acts was harmless.  We agree with the People.

The People alleged that the conspiracy ended "on or about" April 23, 2014.  Overt acts 103 and 104 contain statements admitted as declarations of a coconspirator (Evid. Code, § 1223) that took place in May 2014, after the conspiracy allegedly ended.[17]  A conspiracy usually ends when the substantive crime for which the coconspirators are being tried is either attained or defeated.  (*People v. Leach* (1975) 15 Cal. 3d 419, 431.)  Nonetheless, it is a question for the fact finder to determine when a charged conspiracy has ended, "considering the unique and the nature and purpose of the conspiracy of each case."  (*People v. Saling* (1972) 7 Cal. 3d 844, 852.)

The precise date on which an offense was committed need not be stated in an accusatory pleading unless the date is material to the offense.  (§ 955.)  For example, in *People v. Peyton* (2009) 176 Cal. App. 4th 642 (*Peyton*), the defendant had been charged with committing certain sex offenses against a child "'on or about October 1, 2005,'" but the evidence showed that the offenses occurred in the fall of 2004.  (*Id.* at p. 660.)  The appellate court upheld the convictions despite this variance, finding that "evidence is not insufficient merely because it shows the offense was committed on another date," the October 1, 2005 date was not material to any of the charged offenses, and defendant showed no prejudice.  (*Ibid.*)

Here, the alleged April 23, 2014 end date was not material to the conspiracy charge, nor were the jurors instructed on the beginning or end date of the conspiracy.  Rather, the court instructed the jurors that the crime required the commission of one of the 104 alleged overt acts, but did not require all jurors to agree on the specific act or acts committed.  Additionally, the jurors were instructed that they could only consider statements of

---

[17]     [footnote in original] Overt act 103 alleged, "On or about May 9, 2014, Emanuel Peavy posed in a photograph with a firearm wearing a red 'THS' (Tiny Hit Squad) shirt with 'Brims,' and 'Fuck Crabs' on the back of the shirt.'"  Overt act 104 alleged, "On or about May 10, 2014, the message, 'Fuck Wet Toast!!!!!!!!! 3-11 Till My Motherfuckin DEATH,' was posted to Leron Johnson's Facebook account."

coconspirators "made before or during the time that the defendants were participating in the conspiracy." (CALCRIM No. 418.) Thus, it was up to the jury to determine the precise end date of the conspiracy and whether the coconspirators statements alleged in overt acts 103 and 104 were part of the conspiracy.

Simpson next complains that the evidence did not support overt acts 15 and 44, noting that the prosecution failed to present any evidence to support overt act 15.[18]  Overt act 44 alleged that "on or about October 1, 2013" Simpson and Paris posed in a photograph with Simpson displaying Crip Killer hand signs and Paris imitating shooting a gun with his hand, but this was inaccurate because Simpson was in custody on that date and could not have posed for a photograph.

We fail to discern any prejudice based on the inclusion of overt acts 15 and 44 in the instructions.  The court instructed the jurors that the People were required to prove the commission of at least one overt act, but that they did not need to agree on which specific over act or acts were committed.  If the evidence did not support overt acts 15 and 44, then none of the jurors could not have relied on these two overt acts to support the conspiracy convictions.

d.    Right to free speech

Simpson joined in Hoskins's argument his conspiracy conviction violated his right to free speech under the First Amendment and the California constitution because the prosecution presented evidence of his social media postings to support the conviction as overt acts 11, 21, and 73.  The People contend Simpson forfeited this claim by failing to object to the social media evidence on this ground post.  Even assuming the issue is properly before us, the People assert the argument is meritless because Simpson is not being punished for his social media posts, but for a conspiracy to commit murder.  We decline to deem this constitutional challenge forfeited because we easily reject the argument on its merits.

As the People correctly note, Simpson is being punished for his participation in a conspiracy, not for his social media posts.  Evidence Code section 1220 allows evidence of a statement by a declarant that is offered against him.  Simpson's social media posts qualify as an admission under this

---

[18]    [footnote in original] Overt act 15 alleged, "On or about June 6, 2012, Dionte Simpson posed in a video posted onto Youtube displaying Fuck Neighborhood Crips hand signs with his right hand in the shape of a gun pointed at Neighborhood Crips hand sign."

section and were admissible to prove his participation in the conspiracy. (*People v. Hardy* (1992) 2 Cal. 4th 86, 142 [defendants' statements admissible to prove participation in a conspiracy].)   The "admission of . . . evidence, relevant to actual criminal conduct, does not violate [a defendant's] constitutional free speech rights." (*People v. Smith* (2003) 30 Cal. 4th 581, 626; *People v. Quartermain* (1997) 16 Cal. 4th 600, 629 ["evidence [of racial epithets] was relevant to the issues being tried, and thus its use did not violate the First Amendment"].)

(ECF No. 39-1 at 20–28.)

### iii.    Elements of Crime

The crime of conspiracy under California law has four elements: "1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator." *People v. Ware*, 14 Cal. 5th 151, 163 (2022); *see also People v. Morante*, 20 Cal. 4th 403, 416 (1999) (a conspiracy conviction "requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act by one or more of the parties to such agreement in furtherance of the conspiracy." (internal quotation marks and citation omitted)).   "The law of conspiracy . . . permit[s] the imposition of criminal sanctions for [an] agreement alone, plus an overt act in pursuit of it, regardless of whether the crime agreed upon actually is committed." *United States v. Feola*, 420 U.S. 671, 694 (1975).

### iv.    Analysis

### (a)    AB 333

The Court will first address Petitioner's argument that the People attempted to prove that Petitioner engaged in a conspiracy solely by offering gang evidence, which must now be bifurcated under AB 333 and was therefore improperly admitted in the substantive portion of Petitioner's trial.  (ECF No. 30-1 at 19.)  In response, Respondent argues that Petitioner failed to exhaust this issue by raising it before the California Supreme Court.

(ECF No. 34-1 at 29.)    However, even if Petitioner had exhausted the argument, Respondent argues it must fail because "nothing in AB 333 limits the introduction of gang evidence where the gang evidence is relevant to the underlying charges."  (*Id.* at 30.) Respondent further argues that this is a state legal issue that is not properly raised on federal habeas corpus.  (*Id.* at 29–30.)

As discussed by the Court of Appeal, AB 333, which became effective on January 1, 2022, made the following changes to the law on gang enhancements:

> "'In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (STEP Act; § 186.20 et. seq.) to eradicate criminal activity by street gangs.'" [Citation.]  Among other things, the STEP Act created 'a sentencing enhancement for a felony committed "for the benefit of, at the direction of, or in association with any criminal street gang" (§ 186.22, subd. (b)(1)).'"  (*People v. Tran* (2022) 13 Cal. 5th 1169, 1205–1206 (*Tran*).)    The purpose of the STEP Act was to increase punishment for defendants who commit felonies in furtherance of criminal street gang activity.  (*People v. Fuentes* (2016) 1 Cal. 5th 218, 223.)

> In 2000, in an initiative measure known as Proposition 21, voters amended the STEP Act.  (*People v. Lopez* (2022) 12 Cal. 5th 957, 969.) Among other things, Proposition 21 added section 182.5 to the Penal Code to create the crime of gang conspiracy.  (*Ibid.*)[19]  Section 182.5 provides, in relevant part, "[A]ny person who actively participates in any criminal street gang, as defined in subdivision (f) of Section 186.22, with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, as defined in subdivision (e) of Section 186.22, and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang is guilty of conspiracy to commit that felony and may be punished

---

[19]    [footnote in original] Proposition 21 also added a list of new special circumstances in which the punishment for first degree murder is set at death or life in prison without the possibility of parole, including a gang murder enhancement where "'[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang.'  (Prop. 21, § 11; see § 190.2, subd. (a)(22)).)"  (*People v. Rojas* (2022) 80 Cal.App.5th 542, 550 (*Rojas*) review granted Oct. 19, 2022, S275835.)

as specified in subdivision (a) of Section 182." Thus, section 185.2 expressly incorporates specific provisions of section 186.22. "Proposition 21 also amended the existing gang enhancement in section 186.22, subdivision (b)(1) to create a new tiered system of enhancements with five-year enhancements for individuals convicted of serious felonies and 10-year enhancements for individuals convicted of violent felonies." (*People v. Lopez*, at pp. 969–970.)

In 2021, the Legislature passed Assembly Bill 333, which became effective on January 1, 2022. (*Tran*, supra, 13 Cal. 5th at p. 1206.) Assembly Bill 333 made several amendments to section 186.22, subdivisions (e) and (f) which are integral to the interpretation of gang conspiracy statute and the gang and gang-related firearm enhancements. When defendants were tried, former section 186.22 defined a "'criminal street gang'" as "any ongoing organization, association, or group of three or more persons . . . whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) Assembly Bill 333 narrowed the definition to "an ongoing, organized association or group of three or more persons . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.) This change requires that the People "prove that two or more gang members committed each predicate offense." (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1072.)

Under the former version of section 186.22, the phrase "pattern of criminal gang activity" was defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of [specified] offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, by two or more *persons*." (Former § 186.22, subd. (e), italics added.)

Assembly Bill 333 changed this definition. Now, the predicate offenses must have been committed by two or more "members" of the gang (as opposed to any persons) and must have "*commonly* benefited a criminal street gang" and "the common benefit of the offense [must be] more than reputational. (§ 186.22, subd. (e)(1), italics added.) Additionally, at least one of these predicate offenses must occur after the effective date of this chapter, and the last of those offenses must have occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed. (*Ibid.*) The currently charged offense no longer counts as a predicate offense. (§ 186.22, subd. (e)(2).) The new law also

reduced the number of qualifying offenses that can be used to establish a pattern of criminal gang activity, removing vandalism, looting and several fraud-related offenses from the list.  (§ 186.22, subd. (e)(1)(A)-(Z).)

Assembly Bill 333 requires the prosecution to prove the benefit the gang derives from the current offenses is "more than reputational."  (Stats. 2021, ch. 699, § 3 [enacting § 186.22, subd. (g)].)  "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (§ 186.22, subd. (g).)  Finally, Assembly Bill 333 added section 1109 requiring bifurcation of gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense.  (Stats. 2021, ch. 699, § 5.)  The defendant's guilt on the underlying offense must first be determined, and a trial on the gang enhancement is held if the defendant is first found guilty of the underlying offense.  (§ 1109, subds. (a)(1) & (a)(2).)

The changes to section 186.22 made by Assembly Bill 333 "affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22."  (*People v. Lopez* (2021) 73 Cal.App.5th 327, 346.)  As we noted above, a gang conspiracy under section 182.5 incorporates the proof requirements for "criminal street gang" as defined in section 186.22.  Additionally, the gang-firearm enhancement (§ 12022.53, subd. (e)(1)(A)) and gang-murder special circumstance (§ 190.22, subd. (a)(22)) incorporate the proof requirements of section 186.22.

(ECF No. 39-1 at 64–67.)

The record indicates that Petitioner first raised an argument regarding AB 333 in his supplemental brief before the Court of Appeal on January 11, 2023.  (ECF No. 38-18.) Petitioner argued that his gang and gang-related enhancements should be reversed for insufficient proof and instructional error under AB 333.  (*Id.* at 8–17.)  The Court of Appeal agreed with Petitioner and reversed his gang conspiracy conviction (Count 6), vacated the true findings on the gang enhancement allegations on Counts 1 through 5, and vacated the true findings on the gang-related firearm enhancement allegations on Counts 2 and 3.  (ECF No. 39-1 at 79.)  The court then instructed the People to decide whether to retry Petitioner for gang conspiracy (Count 6), the gang enhancement allegations, and the gang-related

firearm enhancement allegations.  (*Id.*)  Therefore, the Court of Appeal determined that Petitioner was entitled to the benefit of AB 333 without addressing or considering the argument of whether AB 333 rendered Petitioner's conspiracy conviction unconstitutional.

Petitioner argues that he exhausted this argument by making a "very broad claim" for "the ameliorative benefits of AB 333" before the Court of Appeal, which encompassed this claim.  (ECF No. 41-1 at 9 (citing ECF No. 38-19 at 15).)  This Court disagrees. Petitioner's brief did not "fairly present" the substance of the instant claim to the state courts.  *See Gatlin v. Madding*, 189 F.3d 882, 887 (9th Cir. 1999) (noting that "[i]t is not sufficient to raise only the facts supporting the claim; rather, the constitutional claim . . . inherent in those facts must be brought to the attention of the state court" (internal quotation marks and citation omitted)).  The exhaustion requirement is not "satisfied by the mere circumstance that the due process ramifications of an argument might be self-evident." *Id.* (internal quotation marks omitted and citation omitted)).

Based on the foregoing, the Court finds that Petitioner did not exhaust this argument. However, because the Court finds that the claim is not colorable, it will address the argument. *See Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (holding that "a federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim").

First, to the extent Petitioner is arguing a violation of California Penal Code section 1109, the argument is not cognizable in federal habeas corpus.  *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law." (internal quotation marks omitted)).  A violation of section 1109 implicates state law and is not cognizable in federal habeas corpus. *See Reyes v. Matteson*, No. 1:23-cv-00958-JLT-EPG-HC, 2023 WL 8623032, at *10 (E.D. Cal. Dec. 13, 2023) (finding that a violation of California Penal Code section 1109 implicates state law and is not cognizable in federal habeas corpus), *report and recommendation adopted*, No. 1:23-cv-00958-JLT-EPG-HC, 2024 WL 626066 (E.D. Cal. Feb. 14, 2024).

Second, as discussed above, the *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. Here, the jury was appropriately instructed on the conspiracy to commit murder charge (Cal. Penal Code ¶¶ 182(a), 187), which does not require any specific findings related to gang activity.[20] Section 1109 contemplates that "[t]he question of the defendant's guilt of the underlying offense shall be first determined," and then only "[i]f the defendant is found guilty of the underlying offense and there is an allegation of [a gang] enhancement" shall there "be further proceedings to the trier of fact on the question of the truth of the enhancement." Cal. Penal Code § 1109(a). The People introduced evidence of gang activity to prove a conspiracy on the underlying offense. Petitioner has not established that this was impermissible under AB 333. The portion of the trial that was impermissible after AB 333, as already considered by the Court of Appeal, was the jury's consideration of the gang enhancements and gang conspiracy charge. Accordingly, the Court finds that Petitioner has not established that the People's introduction of gang evidence at trial violated his due process rights with respect to his conviction for conspiracy to commit murder.

(b)    Insufficient Evidence

As to the sufficiency of evidence, the Court of Appeal's rejection of this claim was not objectively unreasonable. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Petitioner was guilty of conspiracy to commit murder. The Court of Appeal reviewed the entire record in the light most favorable to the judgment, including the relationships, interests, conduct and activities of the alleged conspirators and coconspirators before and during the alleged conspiracy and reasonably concluded that the record supports the reasonable inference that Petitioner and his coconspirators came to a mutual understanding

-----

[20]    (*See* ECF No. 37-13 at 53–56 (compare with gang conspiracy jury instruction).)

to murder rival NC and WCC gang members and that they participated in the conspiracy, committing at least one overt act.  (ECF No. 39-1 at 22–23.)

In finding there was sufficient evidence to establish the existence of the conspiracy and Petitioner's participation in it, the Court of Appeal relied, in part, on testimony from the prosecution's gang expert.  The expert testified that Petitioner was a member of the Brim Hit Squad, a "hit" means to kill someone, and some of the primary activities of Brim included murder and assaults with firearms.  (*See* ECF Nos. 39-1 at 23; 36-11 at 100–04.) The expert further testified that the main rivals of the Brims are the Crips, specifically NC and WCC.  (ECF No. 39-1 at 23.)  As noted by the Court of Appeal, the People also introduced evidence that Peppers' 2011 murder sparked a gang war between Brim and WCC, Petitioner knew Peppers, and Petitioner shot two Crips gang members two months after Peppers' death for which he was convicted of two counts each of attempted murder and assault with a firearm.  (*See* ECF Nos. 39-1 at 23; 36-11 at 104.)  The Court of Appeal further noted that coconspirators Paris, Chavarry, and Lucas were with Petitioner during the June 2011 shooting, and Paris pleaded guilty to aiding and abetting the shooting.  (ECF No. 39-1 at 23.)  Although the June 2011 shooting was not listed as an overt act and occurred prior to the alleged start date of the conspiracy, "[i]ncidents occurring before the start of the conspiracy may be considered as circumstantial evidence supporting the existence of the conspiracy."  (*Id.* (citing *People v. Maciel*, 57 Cal. 4th 482, 515–16 (2013)).)  The Court of Appeal further noted that some time after the June 2011 shooting, but prior to February 2012, Petitioner got "CK" or "Crip Killer"" tattoos on his elbows. (*Id.*)

The Court of Appeal also determined that Adrianna P's statements to the police following her May 2012 arrest provided further circumstantial evidence from which the jury could infer the existence of a conspiracy to commit murder and Petitioner's participation in that conspiracy.  (*Id.* at 23–24.)  In May 2012, Adrianna P., Petitioner's girlfriend, was arrested with a gun in her purse, and she stated at the time that it was placed there by Petitioner.  (ECF Nos. 36-16 at 43–45, 52–55; 36-13 at 166–70.)  She further

stated that everyone looked up to Petitioner, that he got all the guns and passed the guns to lots of people, including Petitioner's coconspirators who pleaded guilty or were convicted of the attempted murder of other gang members committed during the course of the conspiracy. (*Id.* at 55–60; *see also* ECF No. 39-1 at 24.)

In its decision, the Court of Appeal held that the evidence "amply supported the jury's finding" that Petitioner and his coconspirators entered into a tacit agreement to murder rival NC or WCC gang members. (ECF No. 39-1 at 25.) The Court of Appeal further held that the above evidence established Petitioner's participation in this conspiracy and his attempted murder conviction demonstrated that he harbored an intent to kill. (*Id.*) The Court of Appeal also held that the overt act requirement was satisfied by Petitioner's conviction for attempted murder. (*Id.*)

Petitioner makes several arguments before this Court that he made before the Court of Appeal. First, Petitioner argues that gang evidence, in and of itself, is insufficient to demonstrate substantive criminal intent. As the Court of Appeal recognized, while mere association with a gang does not prove a criminal conspiracy, "common gang membership may be part of circumstantial evidence supporting the inference of a conspiracy." (ECF No. 39-1 at 21 (quoting *People v. Superior Ct. (Quinteros)*, 13 Cal. App. 4th 12, 20 (1993)).) Where the "evidence establishes that a particular gang has a specific illegal objective[,] evidence of gang membership may help to link gang members to that objective." *United States v. Garcia*, 151 F.3d 1243, 1247 (9th Cir. 1998). As discussed above, the Court of Appeal reasonably found that the evidence "amply" supported the jury's findings and was not limited solely to Petitioner's membership in a gang. (*See* ECF No. 39-1 at 22–25.)

Next, Petitioner argues that the People failed to actually prove that he entered into an agreement with anyone to commit murder as to any of the eighteen shootings offered to prove this count, and the People were not even able to identify a shooter in twelve of them. (ECF No. 30-1 at 20.) As stated by the Court of Appeal, "[i]t is seldom possible for the prosecution to offer direct evidence of an agreement to commit a crime. The agreement to

commit the crime is usually made in secrecy.  The conspiracy must be inferred by the trier of fact from all the circumstances that are proven, and if the inference is a reasonable one it will not be disturbed on appeal."  (ECF No. 39-1 at 20 (quoting *People v. Chavez*, 208 Cal. App. 2d 248, 253 (1962)).  "Common design is the essence of a conspiracy and the crime can be committed whether the parties comprehend its entire scope, whether they act in separate groups or together, by the same or different means known or unknown to them, if their actions are consistently leading to the same unlawful result[.]"  *People v. Means*, 179 Cal. App. 2d 72, 80 (1960) (citation omitted).  "Evidence is sufficient to prove [an agreement] if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime.  The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy."  *Maciel*, 57 Cal. 4th at 515–16 (citations and internal quotation marks omitted).  Here, the Court of Appeal's determination that the record supports the reasonable inference that Petitioner and his coconspirators came to a mutual understanding to murder rival NC and WCC gang members, and that Petitioner participated in the conspiracy, was objectively reasonable.  (*See* ECF No. 39-1 at 22–23.)

Next, Petitioner argues that the People failed to connect him to the social media posts which were introduced at trial as evidence of overt acts, that he was only identified in two of the 104 overt acts, two of the overt acts took place outside the duration of the conspiracy, and he was in custody during seventy of the overt acts.  (ECF No. 30-1 at 20–21.)  However, as explained by the Court of Appeal, "[o]ther than the agreement, the only act required is an overt act by any of the conspirators, not necessarily the defendant, and that overt act need not itself be criminal."  (ECF No. 39-1 at 21 (quoting *People v. Smith*, 60 Cal. 4th 603, 616 (2014)); *see also id.* at 25 n.11.  Thus, as the Court of Appeal correctly determined, Petitioner did not need to personally participate in any of the overt acts so long as he conspired to commit the crime and any coconspirator committed an overt act.  (*Id.* at 25 n.11.)

///

The Court of Appeal also reasonably rejected Petitioner's arguments that "only two of the 104 overt acts named him, and out of the remaining 100 overt acts, he was in custody for 69 of them, he was not depicted in photographs or involved in any of the social media messages, and there was no evidence he knew or was aware of the social media posts" on the basis that Petitioner did not establish that he withdrew from the conspiracy when he went to prison.  (*Id.*)  Despite Petitioner being in custody since June 18, 2013, the Court of Appeal stated that he is legally presumed to continue in the conspiracy once his participation in the conspiracy is shown, unless he is able to prove, as a matter of defense, that he effectively withdrew from the conspiracy, and he did not.  (*Id.*)  Petitioner does not challenge the Court of Appeal's statements of the law or its statement that Petitioner did not make a showing that he effectively withdrew from the conspiracy.  Accordingly, these arguments must fail.

Lastly, Petitioner argues that Adrianna P.'s testimony was devoid of evidentiary weight because she admitted to fabricating Petitioner's involvement in her statements to law enforcement and she was an accomplice, yet her testimony was uncorroborated.  (ECF No. 30-1 at 21.)  The Court of Appeal recognized that Adrianna P. recanted her earlier statements to police but found Petitioner's arguments regarding them "misplaced" because the court "may not reweigh the evidence or substitute or own assessment of the witnesses' credibility for the determination made by the jury."  (ECF No. 39-1 at 24, n.9 (citing *People v. Snow*, 30 Cal. 4th 43, 66 (2003)).)  As previously stated, it is "the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict."  *Walters*, 45 F.3d at 1358 (citation omitted).

The Court of Appeal further rejected Petitioner's contention that Adrianna P's testimony regarding putting the gun in her purse cannot be considered because it is uncorroborated accomplice testimony.  (ECF No. 39-1 at 24 n.10.)  The Court of Appeal reasoned that the jury instructions required jurors to decide whether Adrianna P. was an accomplice to the crimes alleged against appellants, and assuming the jury found Adrianna

P. was an accomplice, the testimony that Petitioner put a gun in her purse, which is evidence that goes to the existence of the conspiracy, need not be corroborated. (*Id.* (citing *People v. Cooks*, 141 Cal. App. 3d 224, 312 (1983) ("The testimony of an accomplice is sufficient to establish the fact or existence of a conspiracy (the corpus delicti); his or her testimony needs corroboration only as to the defendant's connection with it."); *People v. Buono*, 191 Cal. App. 2d 203, 215–16 fn. omitted (1961) ("[T]he corroboration required by Penal Code, section 1111 does not include the corpus delicti and is confined to the matter of connection of the individual defendant with the crime.").)  Federal courts reviewing habeas matters are bound by "a state court's interpretation of state law." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Based on the foregoing, the Court of Appeal's decision was neither contrary to, nor involved an unreasonable application of, the *Jackson* standard.  Nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Petitioner is not entitled to habeas relief on this claim.

**B.    There Was No Instructional Error (Claims Two and Three)**

1.    Arguments

In Claim Two, Petitioner argues that he was denied his federal due process rights in violation of the Fifth, Sixth, and Fourteenth Amendments where the jury was permitted to consider overt acts after the conspiracy terminated and overt acts that were not proven to support Count 1.  (ECF No. 30-1 at 21–23.)  Specifically, Petitioner argues that his due process rights were violated where overt acts 103 and 104, which include coconspirator statements that were admitted under California Evidence Code § 1223, took place after the conspiracy terminated. (*Id.* at 22.)  Petitioner notes that the People alleged that the primary object of the conspiracy was murder and charged in the information that the conspiracy ended on April 23, 2014. (*Id.*)  Overt acts 103 and 104, however, were statements made on or about May 9 and 10, 2014.  (ECF No. 37-13 at 46–47.)

Petitioner further argues that it was incredibly prejudicial to him that the prosecution included overt act 15, for which it did not present any evidence at trial, and a photograph

that it claimed Petitioner participated in with Paris on a date Petitioner was in custody. (ECF No. 30-1 at 22.)    Petitioner contends that these submissions to the jury were prejudicial to him as the jury was not required to unanimously agree upon or reveal which of the overt acts it found satisfied the conspiracy, and these overt acts could have been the overt act that the jury found satisfied the conspiracy.    (*Id.* at 22–23.)    In response, Respondent argues the Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law.  (ECF No. 34-1 at 31–34.)

In Claim Three, Petitioner argues that he was denied his federal due process rights in violation of the Fifth, Sixth, and Fourteenth Amendments when the jury was instructed using CALCRIM 418.  (ECF No. 30-1 at 23–26.)    Specifically, Petitioner argues that CALCRIM 418 as presented to the jury was unconstitutional because it relieved the prosecution of its burden to prove every element of the offense beyond a reasonable doubt and allowed the jury to convict Petitioner based on a preponderance of the evidence standard.  (*Id.* at 25–26.)    In response, Respondent argues that state court reasonably denied this claim because the instructions as a whole properly instructed the jury on the prosecution's burden of proof.  (ECF No. 34-1 at 35.)

2.    <u>Applicable Law</u>

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  Instructional error warrants federal habeas relief only if the "'instruction by itself so infected the entire trial that the resulting conviction violates due process[.]'"  *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009) (citation and internal quotation marks omitted); *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).  The instruction must be more than merely erroneous; rather, the petitioner must show there was a "reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *McNeil*, 541 U.S. at 437 (citations and internal quotation marks omitted); *Sarausad*, 555 U.S. at 190–91*; see also Cupp v. Naughten*, 414 U.S. 141, 146 (1973) ("Before a federal court may overturn a conviction resulting from a state trial in which [an allegedly faulty] instruction was used,

it must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.").

Further, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citation omitted); *Sarausad*, 555 U.S. at 191. If a constitutional error occurred, federal habeas relief remains unwarranted unless the error caused prejudice, *i.e.*, unless it had a substantial and injurious effect or influence in determining the jury's verdict. *Hedgpeth v. Pulido*, 555 U.S. 57, 61–62 (2008) (per curiam) (citing *Brecht*, 507 U.S. at 623). Petitioner does not satisfy these standards for habeas relief.

### 3. <u>Claim Three</u>

#### a. *Court of Appeal Decision*

The Court of Appeal addressed Petitioner's Claim Three argument as follows:

1. Additional Background

The information identified numerous overt acts which contained statements of oral or written expression, or nonverbal conduct. The court admitted some of the statements under the admissions of a coconspirator exception to the hearsay rule. (Evid. Code, § 1223.) The trial court, without objection, instructed with CALCRIM No. 418, which provided:

"**In deciding whether the People have proved that the defendants committed the crime charged, you may not consider any statement made out of court by** Edward Paris, Leron Johnson, Nicholas Hoskins, Dionte Simpson, Victor Ware, Damonte Lucas, Norman Sanchez, Emanuel Peavy, Lamont Holman, Maurice Chavarry, Sherbly Gordon, Steven Mahaney, Rahman Taylor, Deandre Cooper, Jamon Smith, Nino Sanchez, Mykein Price, Timothy Hurst,

Clyde Ellis, Edward Laplanche, Aaron Hurst,[21] or **unless the People have proved by a preponderance of the evidence that**:

"1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made;

"2. [The co-conspirators] were members of and participating in the conspiracy when they made the statement;

"3. [The co-conspirators] made the statement in order to further the goal of the conspiracy; [¶] AND

"4. The statement was made before or during the time that the defendants were participating in the conspiracy.

"A *statement* means an oral or written expression, or nonverbal conduct intended to be a substitute for an oral or written expression. [¶] *Proof by a preponderance* of the evidence is a different standard of proof than proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.  [¶]  You may not consider statements made by a person who was not a member of the conspiracy even if the statements helped accomplish the goal of the conspiracy.  [¶]  You may not consider statements made after the goal of the conspiracy had been accomplished." (Bolding added.)

2. Analysis

Appellants contention that CALCRIM No. 418 informed the jury that their intent and the coconspirator's statements could be proved by a preponderance of the evidence which violated their constitutional right to due process by lessening the prosecution's burden of proof.  Simpson asserts that this erroneous instruction affected his substantial rights so that we should reach the merits of his claim despite defense counsel's failure to object.  The People assert that appellants forfeited this claim by failing to object to the instruction at trial.  In any event, the People claim that the instructions as a whole properly instructed the jury on the prosecution's burden of proof.  We consider appellants' arguments on their merits because "[a]scertaining whether claimed instructional error affected the substantial rights of the

---

[21]    [footnote in original] We collectively refer to these individuals as "the coconspirators."

defendant necessarily requires an examination of the merits of the claim . . . ." (*People v. Andersen* (1994) 26 Cal. App. 4th 1241, 1249.)

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal. 4th 193, 218.) We "first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights." (*People v. Andrade* (2000) 85 Cal. App. 4th 579, 585.) Where the "determination of error depends on the meaning communicated by an instruction, we must ascertain how a hypothetical 'reasonable juror' would have, or at least could have, understood the words in question." (*People v. Mickey* (1991) 54 Cal. 3d 612, 670.) "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."'" (*People v. Musselwhite* (1998) 17 Cal. 4th 1216, 1248.) Additionally, we must interpret the instructions at issue to support the judgment rather than defeat it, so long as the instructions are reasonably susceptible of such an interpretation. (*People v. Sy* (2014) 223 Cal. App. 4th 44, 59.)

"Evidence Code section 1223 provides an exception to the hearsay rule as to statements made during the existence of a conspiracy that are in furtherance of its objective." (*People v. Herrera* (2000) 83 Cal. App. 4th 46, 59.) CALCRIM No. 418 is tied to Evidence Code section 1223 and must be given when a coconspirator's statement has been admitted under Evidence Code section 1223.[22] (Judicial Council of Cal. Crim. Jury Instns. (2018), Bench Notes to CALCRIM No. 418, p. 219.) CALCRIM No. 418 protects criminal defendants by instructing the jury not to consider statements made by coconspirators unless the People have proven, by a preponderance of the evidence, that there was a conspiracy, the declarant was a member of the conspiracy, the declarant made the statement to further the goal of the

---

[22]    [footnote in original] Evidence Code section 1223 states, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

conspiracy, and the statement was made before or during the time the defendant was participating in the conspiracy.

Appellants' argument is based on a misreading of the instruction. The first paragraph of CALCRIM No. 418 clearly informed the jurors that they could not consider any coconspirator's out-of-court statements in deciding the conspiracy charges unless the People proved by a preponderance of the evidence four requirements for considering the out-of-court statements. CALCRIM No. 418 did not instruct the jurors regarding what they needed to find to convict appellants of conspiracy. On this issue, the court instructed with CALCRIM No. 563 which provided that the People would have to prove four elements, the existence of an agreement, the necessary intent to agree and kill, and the commission of an overt act. In turn, CALCRIM No. 220 expressly told the jury, "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise." CALCRIM No. 418 is not confusing and, when considered with the other instructions provided to the jury, did not reduce the prosecution's burden of proof.

Accordingly, we reject appellants' claim of instructional error.
(ECF No. 39-1 at 48–51.)

        b.    *Analysis*

Petitioner argues that CALCRIM 418 was unconstitutional because it relieved the prosecution of its burden to prove every element of the offense beyond a reasonable doubt and allowed the jury to convict Petitioner based on a preponderance of the evidence standard. (ECF No. 30-1 at 25–26.) "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). A trial court must instruct the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, but "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Victor*, 511 U.S. at 5. Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury. *Id.*; *Holland v. United States*, 348 U.S. 121, 140 (1954). The proper inquiry is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based

on proof insufficient to meet the *Winship* standard." *Victor*, 511 U.S. at 6; *Lisenbee v. Henry*, 166 F.3d 997, 999 (9th Cir. 1999).

As the Court of Appeal explained, "CALCRIM No. 418 clearly informed the jurors that they could not consider any coconspirator's out-of-court statements in deciding the conspiracy charges unless the People proved by a preponderance of the evidence four requirements for considering the out-of-court statements," but it "did not instruct the jurors regarding what they needed to find to convict appellants of conspiracy." (ECF No. 39-1 at 51.) On this issue, the trial court gave instruction "CALCRIM No. 563 which provided that the People would have to prove four elements, the existence of an agreement, the necessary intent to agree and kill, and the commission of an overt act." (*Id.*) "In turn, CALCRIM No. 220 expressly told the jury, 'Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.'" (*Id.*) The Court of Appeal concluded that "CALCRIM No. 418 is not confusing and, when considered with the other instructions provided to the jury, did not reduce the prosecution's burden of proof." (*Id.*) This Court agrees.

As laid out in the record, in pre-instructing the jury, the trial court advised:

> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically instruct you otherwise.
>
> Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.
>
> In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that's received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he's entitled to an acquittal and you must find him not guilty.

(ECF No. 36-6 at 8.)

In its end-of-trial instructions, the trial court specifically instructed the jury on the elements of conspiracy to commit murder by giving instruction CALCRIM No. 563 as follows:

> To prove that a defendant is guilty of this crime, the People must prove that: One, the defendant intended to agree and did agree with one or more members of the conspiracy to intentionally and unlawfully kill; two, at the time of the agreement, the defendant and one or more of the alleged members of the conspiracy intended that one or more of them would intentionally and unlawfully kill; three, one of the defendants or members of the conspiracy committed at least one of the following overt acts alleged to accomplish the killing; and, four, at least one of these overt acts was committed in California.

(ECF No. 37-13 at 27–28; *see also* CALCRIM No. 563 (Conspiracy to Commit Murder, Penal Code § 182).)

The trial court then identified 104 overt acts (*id.* at 28–47), and continued:

> Folks, to decide whether a defendant committed these overt acts, consider all of the evidence presented about the overt acts.
>
> To decide whether a defendant and one or more of the other alleged members of the conspiracy intended to commit murder, Penal Code Section 187, please refer to the separate instructions that I will give you on that crime.
>
> The People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder, Penal Code Section 187. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime. An agreement may be inferred from conduct if you conclude that the members of the alleged conspiracy acted with a common purpose to commit the crime.
>
> An overt act is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed-upon crime. The overt act must happen after the defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.
>
> You must all agree that at least one alleged overt act was committed in California by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the – the act or overt acts.

You must make a separate decision as to whether each defendant was a member of the alleged conspiracy.

A member of a conspiracy does not have to – does not have to personally know the identity or roles of all the other members.

Someone who merely accompanies or associates with members of a conspiracy but who does not intend to commit the crime is not a member of the conspiracy.

Evidence that a person did an act or made a statement that helped accomplish the goal of the conspiracy is not enough, by itself, to prove that the person was a member of the conspiracy.

In deciding whether the People have proved the defendants committed the crime charged, you may not consider any statement made out of court by Edward Paris, Leron Johnson, Nicholas Hoskins, Dionte Simpson, Victor Ware, Damonte Lucas, Norman Sanchez, Emanuel Peavy, Lamont Holman, Maurice Chavarry, Sherbly Gordon, Steven Mahaney, Rahman Taylor, Deandre Cooper, Jamon Smith, Nino Sanchez, Mykein Price, Timothy Hurst, Clyde Ellis, Edward Laplanche, Aaron Hurst, or unless the People have proved by a preponderance of the evidence that:

Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made;

Edward Paris, Leron Johnson, Nicholas Hoskins, Dionte Simpson, Victor Ware, Damonte Lucas, Norman Sanchez, Emanuel Peavy, Lamont Holman, Maurice Chavarry, Sherley Gordon, Steven Mahaney, Rahman Taylor, Deandre Cooper, Jamon Smith, Nino Sanchez, Mykein Price, Timothy Hurst, Clyde Ellis, Edward Laplanche, Aaron Hurst were members of and participating in the conspiracy when they made the statement;

Three, Edward Paris, Leron Johnson, Nicholas Hoskins, Dionte Simpson, Victor Ware, Damonte Lucas, Norman Sanchez, Emanuel Peavy, Lamont Holman, Maurice Chavarry, Sherbly Gordon, Steven Mahaney, Rahman Taylor, Deandre Cooper, Jamon Smith, Nino Sanchez, Mykein Price, Timothy Hurst, Clyde Ellis, Edward Laplanche, Aaron Hurst made the statement in order to further the goal of the conspiracy;

And, four, the statement was made before or during the time that the defendants were participating in the conspiracy.

A statement means an oral or written expression, or nonverbal conduct intended to be a substitute for an oral or written expression.

Proof by a preponderance of the evidence is a different standard of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

You may not consider statements made by a person who was not a member of the conspiracy even if the statements helped accomplish the goal of the conspiracy.

You may not consider statements made after the goal of the conspiracy has been accomplished.

Homicide is the killing of one human being by another. Murder is a type of homicide. The defendants are charged with conspiracy to commit murder.

Defendants are charged in Count 1 with conspiracy to commit murder, Penal Code Section 182/187.

To prove murder, the People must prove that: One, a person committed an act that caused the death of another person; and, two, when the person acted, he had a state of mind called express malice aforethought.

The person acted with express malice if he unlawfully intended to kill.

Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time.

(*Id.* at 47–50.)

The jury was also instructed as follows:

The fact that a criminal charge has been filed against the defendants is not evidence that the charge is true. You must not be biased against the defendants just because they have been arrested, charged with a crime, or brought to trial.

> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.
>
> Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.
>
> In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendants guilty beyond a reasonable doubt, they are entitled to an acquittal and you must find them not guilty.

(ECF No. 37-13 at 12–13; *see also* CALCRIM No. 220 (Reasonable Doubt).)

The jury was additionally instructed:

> You may not convict a defendant unless the People have proved his guilt beyond a reasonable doubt.

(ECF No. 37-13 at 24.)

The Court finds that these instructions together properly conveyed to the jury that they had to find each element of the offense beyond a reasonable doubt, and "[t]here is no reasonable likelihood that the jurors who determined [Petitioner's] guilt applied the instructions in a way that violated the Constitution." *Victor*, 511 U.S. at 6; *Lisenbee*, 166 F.3d at 999-1000. The jury was instructed repeatedly that the People had the burden of proof as to the guilt of Petitioner and that the standard was beyond a reasonable doubt. The trial court's single discussion of the preponderance standard for the People[23] was limited to the circumstances under which the jury could consider the co-conspirator statements. (ECF No. 37-13 at 48–49.) Moreover, the reasonable doubt standard set forth in these instructions was underscored and re-enforced by the closing arguments of both the

---

[23]    The jury was also instructed that defendant Ware had this lower burden of proof to establish the defense of necessity. (ECF 37-13 at 69.)

prosecutor and defense counsel. (*See, e.g.*, prosecution closing, ECF No. 37-13 at 132 ("Now, at the beginning of this case, Mr. Lawson and I both told you we have the burden to prove every element beyond a reasonable doubt, and we want you to hold us to that burden."); closing by counsel for Petitioner, ECF No. 37-14 at 42 ("The standard of proof in a criminal case beyond a reasonable doubt is so high and the burden of proof, again, is on the People."); closing by counsel for Defendant Ware, *id*. at 46–50, 55, 72, 74; rebuttal closing by the prosecution, *id*. at 137–38 ("Beyond a reasonable doubt. It is our burden. Mr. Simmons told you it's our burden. We embrace it."), 142, 144.)

Petitioner's argument that the instructions relieved the prosecution of its burden to prove each element beyond a reasonable doubt because "the People only had to prove that the statements of the [coconspirators] were made by a preponderance of the evidence, yet this evidence was used to satisfy the elements of whether Petitioner possessed criminal intent and whether an over act occurred" is unavailing. (*See* ECF No. 30-1 at 25–26.) The standard for admitting evidence at trial is different than the standard the jury must apply in determining whether the elements of an offense have been proven. This is not contradictory. Just because the standard for admitting evidence is lower than proof beyond a reasonable doubt does not mean that the jury cannot rely on this evidence or that the jury cannot conclude from the evidence that the People have proven the elements of the offense beyond a reasonable doubt.

Petitioner has not shown there was a "reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *McNeil*, 541 U.S. at 437 (citations and internal quotation marks omitted). Therefore, the Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, and it did not involve an unreasonable determination of the facts.

///

///

///

///

21-cv-01763-CAB-JLB

4. <u>Claim Two</u>

a. *Court of Appeal Decision*

The Court of Appeal addressed Petitioner's Claim Two arguments as follows:

Simpson alleges that his conspiracy convictions must be reversed because the court allowed the jury to consider overt acts 15, 44, 103, and 104 which were not proved or occurred after the conspiracy terminated. He claims that the jury could have based the conspiracy convictions on one of the improperly included overt acts because the verdict form did not require that the jury reveal which overt act they found had been committed and there was no requirement that the jury unanimously agree on the same overt act to support a conspiracy conviction. (*People v. Valdez* (2012) 55 Cal. 4th 82, 154, fn. 40.) The People argue that any error in presenting these four overt acts was harmless. We agree with the People.

The People alleged that the conspiracy ended "on or about" April 23, 2014. Overt acts 103 and 104 contain statements admitted as declarations of a coconspirator (Evid. Code, § 1223) that took place in May 2014, after the conspiracy allegedly ended.[24] A conspiracy usually ends when the substantive crime for which the coconspirators are being tried is either attained or defeated. (*People v. Leach* (1975) 15 Cal. 3d 419, 431.) Nonetheless, it is a question for the fact finder to determine when a charged conspiracy has ended, "considering the unique [circumstances] and the nature and purpose of the conspiracy of each case." (*People v. Saling* (1972) 7 Cal. 3d 844, 852.)

The precise date on which an offense was committed need not be stated in an accusatory pleading unless the date is material to the offense. (§ 955.) For example, in *People v. Peyton* (2009) 176 Cal. App. 4th 642 (*Peyton*), the defendant had been charged with committing certain sex offenses against a child "'on or about October 1, 2005,'" but the evidence showed that the offenses occurred in the fall of 2004. (*Id.* at p. 660.) The appellate court upheld the convictions despite this variance, finding that "evidence is not insufficient merely because it shows the offense was committed on another

---

[24]    [footnote in original] Overt act 103 alleged, "On or about May 9, 2014, Emanuel Peavy posed in a photograph with a firearm wearing a red 'THS' (Tiny Hit Squad) shirt with 'Brims,' and 'Fuck Crabs' on the back of the shirt.'" Overt act 104 alleged, "On or about May 10, 2014, the message, 'Fuck Wet Toast!!!!!!!!! 3-11 Till My Motherfuckin DEATH,' was posted to Leron Johnson's Facebook account."

date," the October 1, 2005 date was not material to any of the charged offenses, and defendant showed no prejudice. (*Ibid.*)

Here, the alleged April 23, 2014 end date was not material to the conspiracy charge, nor were the jurors instructed on the beginning or end date of the conspiracy. Rather, the court instructed the jurors that the crime required the commission of one of the 104 alleged overt acts, but did not require all jurors to agree on the specific act or acts committed. Additionally, the jurors were instructed that they could only consider statements of coconspirators "made before or during the time that the defendants were participating in the conspiracy." (CALCRIM No. 418.) Thus, it was up to the jury to determine the precise end date of the conspiracy and whether the coconspirators statements alleged in overt acts 103 and 104 were part of the conspiracy.

Simpson next complains that the evidence did not support overt acts 15 and 44, noting that the prosecution failed to present any evidence to support overt act 15.[25] Overt act 44 alleged that "on or about October 1, 2013" Simpson and Paris posed in a photograph with Simpson displaying Crip Killer hand signs and Paris imitating shooting a gun with his hand, but this was inaccurate because Simpson was in custody on that date and could not have posed for a photograph.

We fail to discern any prejudice based on the inclusion of overt acts 15 and 44 in the instructions. The court instructed the jurors that the People were required to prove the commission of at least one overt act, but that they did not need to agree on which specific over act or acts were committed. If the evidence did not support overt acts 15 and 44, then none of the jurors could []have relied on these two overt acts to support the conspiracy convictions.

(ECF No. 39-1 at 25–28.)

b.    *Analysis*

First, Petitioner argues that the trial court's inclusion of overt acts 103 and 104 was prejudicial to him because they occurred after the time the conspiracy was alleged to have ended, as set forth in the charging information. (ECF No. 30-1 at 22.) The Court of Appeal

---

[25]    [footnote in original] Overt act 15 alleged, "On or about June 6, 2012, Dionte Simpson posed in a video posted onto Youtube displaying Fuck Neighborhood Crips hand signs with his right hand in the shape of a gun pointed at Neighborhood Crips hand sign."

determined that any error in presenting these overt acts was harmless because the end date was not material to the conspiracy charge, the jurors were not instructed on the beginning or end date of the conspiracy, and ultimately, "it is a question for the fact finder to determine when a charged conspiracy has ended." (ECF No. 39-1 at 26–27.)

As the Court of Appeal stated, the jury instructions did not indicate a time frame for the conspiracy. (*See* ECF No. 37-13 at 27–50.)[26] The trial court instructed the jury on the elements of the crime and listed 104 overt acts, dating from January 5, 2012, to May 10, 2014. (*Id.* at 28–47.) The jury was further instructed that "[t]he overt act must happen after the defendant has agreed to commit the crime." (*Id.* at 47.) The jury was also instructed that it could not consider an out-of-court statement made by an alleged member of the conspiracy unless the People proved by a preponderance of the evidence that, *inter alia*, the individual was a member of, and participating in, the conspiracy when they made the statement, and the "statement was made before or during the time that the defendants were participating in the conspiracy." (*Id.* at 48–49.) Lastly, the jury was instructed that it "may not consider statements made after the goal of the conspiracy has been accomplished." (*Id.* at 50.)

Ultimately, as the Court of Appeal stated, regardless of the date listed in the accusatory pleading,[27] "it was up to the jury to determine the precise end date of the

---

[26]    Respondent construed this argument as one of instructional error and argued that "[i]ssues regarding jury instructions are not cognizable on federal habeas corpus unless the instructions infect the entire trial by either relieving the prosecution of its burden of proving an element of the offense or altering the burden of proof." (ECF No. 34-1 at 33.)

[27]    Petitioner suggests that the end date of the conspiracy in the information was determinative and any overt act that occurred after that date should not have been introduced to the jury and was prejudicial. (ECF No. 30-1 at 22.) However, as the Court of Appeal stated, "[t]he precise date on which an offense was committed need not be stated in an accusatory pleading unless the date is material to the offense." (ECF No. 39-1 at 26 (citing *People v. Peyton*, 176 Cal. App. 4th 642 (2009)).) Petitioner cites no U.S. Supreme Court case holding otherwise. While the Sixth Amendment guarantees that a defendant be "informed of the nature and cause" of the criminal charges to be presented at trial, U.S.

conspiracy and whether the coconspirators statements alleged in overt acts 103 and 104 were part of the conspiracy." (ECF No. 39-1 at 27.) Accordingly, Petitioner has not established there was instructional error with respect to overt acts 103 and 104, and certainly not error that violates due process. Therefore, the Court of Appeal's determination on this argument was not contrary to, nor an unreasonable application of clearly established Federal law, nor based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 2254(d).

Next, Petitioner argues that there is no dispute that the prosecution did not present any evidence in support of overt act 15, yet it was submitted to the jury. (ECF No. 30-1 at 22.) He further argues that he was in custody when the photograph at issue in overt act 44 was allegedly taken, yet it was also submitted to the jury. (*Id.*) Overt act 15 was read to the jury as follows: "On or about June 6, 2012, Dionte Simpson posed in a video posted on YouTube displaying 'Fuck Neighborhood Crips' hand signs with his right hand in the shape of a gun pointed at 'Neighborhood Crips' hand sign." (ECF No. 37-13 at 31.) This video was not played to the jury. (*See* ECF No. 37-14 at 13.) Overt act 44 was read to the jury as follows: "On or about October 1st, 2013, Dionte Simpson and Edward Paris posed in a photograph with Simpson displaying 'Crip Killer' hand signs and Paris imitating shooting a gun with his hand." (ECF No. 37-13 at 36.)

---

CONST., amend. VI, clearly established Federal law only requires the substance of the charging document to apprise the defendant in an appreciable way the charges against him so that he may prepare a defense accordingly. *Gautt v. Lewis*, 489 F.3d 993, 1004 (9th Cir. 2007). Here, the amended Information informed Petitioner of the specific criminal statutes for which he was being charged and with respect to the conspiracy charge, stated that the conspiracy took place "[o]n or about and between January 1, 2012 and April 23, 2014," and listed 104 overt acts, dating between January 5, 2012, and May 10, 2014. (ECF No. 35-4 at 47–57.) Petitioner has not argued that he was not sufficiently apprised of the charges and was unable to prepare a defense. Thus, the Court of Appeal reasonably determined that defendant has shown no prejudice from the inclusion of the April 23, 2014 date in the amended information. (*See* ECF No. 39-1 at 26–27.)

In its decision, the Court of Appeal "fail[ed] to discern any prejudice based on the inclusion of overt acts 15 and 44 in the instructions." (ECF No. 39-1 at 27.) As previously noted, if a constitutional error did occur, Petitioner must demonstrate that the error caused prejudice by showing that the inclusion of these acts "had a substantial and injurious effect or influence in determining the jury's verdict." *See Hedgpeth*, 555 U.S. at 61–62. The Court of Appeal reasoned that the trial court "instructed the jurors that the People were required to prove the commission of at least one overt act, but that they did not need to agree on which specific overt act or acts were committed," and "[i]f the evidence did not support overt acts 15 and 44, then none of the jurors could [] have relied on these two overt acts to support the conspiracy convictions." (ECF No. 39-1 at 27–28.)

Based on the foregoing, the Court finds that the inclusion of overt acts 15 and 44 in the conspiracy instructions did not "by itself so infect[] the entire trial that the resulting conviction violates due process." *See Wadding*, 55 U.S. at 191. Given the lack of evidence presented to support the overt acts, the Court finds that there was not a "reasonable likelihood that the jury . . . applied the challenged instruction in a way that violates the Constitution." *McNeil*, 541 U.S. at 437.

Accordingly, the Court finds that Petitioner has failed to show that the state court's rejection of Claim Three was contrary to, or based on an unreasonable application of, clearly established federal law.

## C.   Petitioner is Not Entitled to Relief on His Cumulative Prejudicial Effect Claim (Claim Five)

In Claim Five, Petitioner argues he was denied his federal right to due process under the Fifth, Sixth, and Fourteenth Amendments due to the cumulative prejudicial effect of the above errors. (ECF No. 30-1 at 29–30.) Specifically, Petitioner argues that if the gang evidence had been "properly bifurcated," as required by AB 333, Petitioner would not have been convicted, "especially in circumstances where the Court of Appeal held that there was insufficient evidence of the gang conspiracy and the gang allegations and enhancements have been reversed." (*Id.* at 30.) Respondent argues this claim must fail because the state

court reasonably determined that there was no error.  (ECF No. 34-1 at 43.)  Therefore, there can be no cumulative error.  (*Id.*)

### 1.  Applicable Law

"Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant."  *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000); *see also Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) ("[T]he Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal.").

### 2.  Court of Appeal Decision

In a footnote, the Court of Appeal stated: "Our conclusion that the trial court did not err renders it unnecessary to address Simpson's cumulative error claim."  (ECF No. 39-1 at 4 n.3.)

### 3.  Analysis

Here, Petitioner has not shown a single instance of constitutional error in his underlying claims, let alone multiple errors that combined to prejudice the outcome of his trial.  For this reason, as stated by the Court of Appeal, Petitioner's claim of cumulative error necessarily fails.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible."); *Mancuso*, 292 F.3d at 957 ("Because there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation.").  Accordingly, the Court of Appeal's denial of Claim Five was not contrary to, or an unreasonable application of, clearly established United States Supreme Court law.

### D.  Petitioner Procedurally Defaulted on Claims Six and Seven

In Claim Six, Petitioner argues that he was denied his federal right to due process under the Fifth, Sixth, and Fourteenth Amendments due to ineffective assistance of trial

counsel.  (Pet. ¶ 56; ECF No. 30-1 at 31–33.)  Specifically, he argues that his trial counsel rendered ineffective assistance in the following ways: (1) by failing to effectively challenge the suggestive identification procedure adopted by the police with respect to Jasicki; (2) by failing to challenge the denial of Petitioner's right to confront and cross-examine the alleged victims in counts two through five; (3) by failing to investigate or subpoena Paris, who pleaded guilty to counts two through five in connection with the June 14, 2011 shooting; (4) by failing to investigate—or request a private investigator to investigate—the area surrounding the shooting, particularly the vantage point described by Jasicki; (5) by failing to adequately investigate prosecutorial misconduct in the prosecution's attempt to induce Jasicki to testify against Petitioner.  (ECF No. 30-1 at 31–39.)

In Claim Seven, Petitioner argues that he was deprived of his federal right to due process under the Fifth, Sixth, and Fourteenth Amendments due to prosecutorial misconduct.  (Pet. ¶ 60; ECF No. 30-1 at 39–41.)  Specifically, Petitioner argues he was subjected to official misconduct in that the police engaged in an improperly suggestive lineup procedure in an attempt to have Jasicki identify Petitioner as the shooter, and the police may have induced Jasicki to falsely testify against Petitioner during the unrecorded portion of her interview.  (ECF No. 30-1 at 39.)

Respondent argues that these claims are procedurally defaulted as untimely.  (ECF No. 34-1 at 43–46.)

### 1.   Applicable Law

AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  "A federal habeas claim is technically exhausted but procedurally defaulted if the state court declined to address the claim based on independent and adequate state procedural grounds." *Rodney v. Garrett*, 116 F.4th 947, 954 (9th Cir. 2024) (citing *Coleman v. Thompson*, 501 U.S. 722, 729–32 (1991)).

For a claim to be procedurally defaulted, the state procedural rule relied on must be "a nonfederal ground adequate to support the judgment" and be "firmly established and

consistently followed." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). Federal courts are generally prohibited from reviewing procedurally defaulted claims. *Coleman*, 501 U.S. at 729–30.

"A state prisoner may overcome the prohibition on reviewing procedurally defaulted claims if he can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation." *Davila v. Davis*, 582 U.S. 521, 528 (2017) (citations and internal quotation marks omitted). To establish "cause," the petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. A factor is external to the defense if it cannot fairly be attributed to the prisoner." *Id.* (internal quotation marks and citations omitted). "[T]o establish prejudice, the prisoner must show not merely a substantial federal claim, such that the errors at trial created a possibility of prejudice, but rather that the constitutional violation worked to his actual and substantial disadvantage." *Shinn v. Ramirez*, 596 U.S. 366, 379–80 (2022) (citation, internal quotation marks, and alterations omitted).

A second exception, known as the fundamental miscarriage of justice, only occurs in an extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *see also McQuiggin v. Perkins*, 569 U.S. 383, 393(2013) ("The miscarriage of justice exception . . survived AEDPA's passage.") Actual innocence means factual innocence, not legal sufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (internal quotation marks omitted). "To be credible, a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324) (internal quotation marks omitted).

///

2.    <u>Background</u>

On January 21, 2020, Petitioner filed his first federal petition for writ of habeas corpus.  (Pet. For Writ of Habeas Corpus, *Simpson v. Madden, et al.*, No. 20-cv-00146-WQH-KSC (S.D. Cal.), ECF No 1.)  The petition asserted one claim for a violation of the confrontation clause related to Count 2.  (*Id.*)  The case was dismissed on May 14, 2020, because Petitioner failed to either pay the filing fee or seek to proceed *in forma pauperis*.  (*Id.*, ECF No. 9.)

In October 2021, Petitioner hired Spolin Law P.C. to review his file and evaluate his post-conviction options.  (ECF No. 39-4 at 5.)  The law firm thereafter advised Petitioner that he may possess meritorious claims based on ineffective assistance of counsel and prosecutorial misconduct.  (*Id.*)

On October 12, 2021, Petitioner commenced the instant habeas corpus proceedings pursuant to 28 U.S.C. § 2254 by filing another petition for writ of habeas corpus.  (ECF No. 1.)  He asserted claims for instructional error and insufficient evidence.  (*Id.*)  On January 24, 2022, Petitioner moved for stay and abeyance so he could exhaust additional claims.  (ECF No. 5.)  The motion was granted on July 8, 2022.  (ECF Nos. 14, 15.)

On June 27, 2022, Petitioner filed a petition for writ of habeas corpus in California Superior Court seeking resentencing relief pursuant to Senate Bill No. 775 and section 1170.95, which was renumbered to section 1172.6.  (ECF No. 39-5 at 2.)  He did not raise any ineffective assistance of counsel or prosecutorial misconduct claims.  The court denied the petition without prejudice on July 21, 2022.  (*Id.*)

On May 5, 2023, Petitioner filed another petition for writ of habeas corpus in California Superior Court, arguing ineffective assistance of counsel and prosecutorial misconduct.  (ECF No. 39-4.)  The Superior Court denied the petition on May 18, 2023, in part, as untimely.  (ECF No. 39-5.)  The Superior Court reasoned:

> The court denies the petition for habeas corpus as untimely.
> "Generally, under California law, there are no fixed, determinate deadlines"
> for filing a habeas corpus petition.  (*Robinson v. Lewis* (2020) 9 Cal. 5th 883,
> 890.)  However, "(a) petitioner will be expected to demonstrate due diligence

in pursuing potential claims.  If a petitioner had reason to suspect that a basis for habeas corpus relief was available, but did nothing to promptly confirm those suspicions, that failure must be justified." (*In re Clark* (l993) 5 Cal. 4th 750, 775.)  In accordance with this principle, the California Supreme Court has established a three-step analysis for timeliness. (*In re Reno* (2012) 55 Cal. 4th 428, 460.)  "First, a claim must be presented without substantial delay." (*Ibid.*)  Second, if substantial delay exists, the Petitioner can attempt to demonstrate good cause therefor.  (*Ibid.*)  Third, a court will consider a delayed claim without good cause if it falls within one of four narrow exceptions: "(i) that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (ii) that the petitioner is actually innocent of the crime or crimes of which he or she was convicted; (iii) that the death penalty was imposed by a sentencing authority that had such a grossly misleading profile of the petitioner before it that, absent the trial error or omission, no reasonable judge or jury would have imposed a sentence of death; or (iv) that the petitioner was convicted or sentenced under an invalid statute." (*Ibid.*)

Here, the grounds for Petitioner's claims existed at the time of Petitioner's trial, which ended in May 2016.  Yet Petitioner waited until May 2023 to file his petition.  This delay of nearly seven years is substantial.  (*See Walker v. Martin* (2011) 562 U.S. 307, 317 ["California's case law made it altogether plain that Martin's delay of nearly five years ranked as 'substantial.'  *See* [*People v.*] *Gallego*, I 8 Cal. 4th, at 829-831, 838, and n.13, 77 Cal.Rptr.2d 132, 959 P.2d at 293-294, and n.13 (delay of four years barred claim) .... "].)  Although Petitioner argues that his lack of knowledge of the law should excuse this delay, his own signed declaration states that he told his trial counsel to further investigate the suggestive lineup procedure and to subpoena Edward Paris.  Thus, Petitioner had apparently already formed the impression that his counsel was substandard at the time of trial.  "Substantial delay is measured from the time the petitioner or counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim." (*In re Robbins* (1998) 18 Cal. 4th 770, 787.)  Here, Petitioner knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim at the time of his trial.  He has failed to demonstrate good cause for the lengthy delay in this case.  Furthermore, none of the four narrow exceptions apply.  Although Petitioner may claim that his petition falls within the actual innocence exception, the allegations he levies "do not cast fundamental doubt on the accuracy and reliability of the trial proceedings, nor undermine the prosecution's entire case and point unerringly to innocence or reduced culpability." (*Reno, supra*, 55 Cal. 4th at 474.)  As a result, the petition does not fall within the carefully

defined and limited actual innocence exception to the timeliness requirement.
Therefore, the petition is denied as untimely.

(ECF No. 39-5 at 4–5.)  The Superior Court also denied the petition on the merits.  (*Id.* at
5–9.)

On August 14, 2023, Petitioner filed a petition for writ of habeas corpus in the Court
of Appeal, arguing ineffective assistance of trial counsel and prosecutorial misconduct.
(ECF No. 39-6.)  The Court of Appeal denied the petition.  (ECF No. 39-7.)  The Court of
Appeal found that the petition was procedurally barred as untimely, but even if it were
timely, Petitioner was not entitled to relief.  (*Id.*)  On the issue of timeliness, the Court of
Appeal reasoned as follows:

> Simpson is not entitled to relief.  Simpson's trial ended in May 2016,
> and his present petition filed in August 2023 is procedurally barred as
> untimely.  (*In re Reno* (2012) 55 Cal. 4th 428, 459; *In re Swain* (1949) 34 Cal.
> 2d 300, 302.)  The petition is further barred because the claims could have
> been raised on appeal, but were not.  (*In re Reno, supra*, at p. 490; *In re Dixon*
> (1953) 41 Cal. 2d 756, 759.)  To explain the delay, Simpson claims he "lacks
> legal training and knowledge", and he was unaware of "the particulars" of his
> claims until he retained private counsel in October 2021.  However, Simpson
> does not describe any efforts he made to investigate his legal bases for relief
> prior to retaining private counsel.  Additionally, his signed declaration states
> that he asked trial counsel to challenge the identification procedure law
> enforcement used to identify him as the shooter, and for trial counsel to
> subpoena a potentially exonerating witness.  These are some of the same
> claims he raises in the present petition, which indicates he was aware of the
> basis for these claims long before retaining private counsel.  Simpson also
> does not explain the 19-month delay between when he retained private
> counsel in October 2021 and when he filed his petition for writ of habeas
> corpus in the superior court in May 2023.  "[A] person making a collateral
> attack on a final judgment must demonstrate diligence in investigating
> possible factual as well as legal bases for relief" and must "explain and justify
> any substantial delay in presenting a claim."  (*In re Clark* (1993) 5 Cal. 4th
> 750, 783, 785, fn. 21.)  "[T]he filing of untimely claims without any serious
> attempt at justification is an example of abusive writ practice."  (*In re Reno*,
> supra, at p. 460.)

(ECF No. 39-7 at 2–3.)

On October 30, 2023, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, arguing ineffective assistance of trial counsel and prosecutorial misconduct.  (ECF No. 39-8.)  The California Supreme Court summarily denied the petition without citation.  (ECF No. 39-9.)

        3.     <u>Analysis</u>

Because the Court of Appeal rejected Petitioner's claims on independent and adequate state procedural grounds, the Court finds that Petitioner's claims for ineffective assistance of counsel and prosecutorial misconduct are procedurally defaulted.  *See Walker v. Martin*, 562 U.S. 307, 317–21 (2011) (finding California's time rule to be an adequate state procedural ground for denying a petitioner's claims).  In his Petition and traverse, Petitioner denies that his claims are untimely, but he does not otherwise respond to Respondent's procedural default argument.  (*See* ECF No. 41.)  As such, Petitioner has neither made a showing of cause and prejudice nor a showing of a fundamental miscarriage of justice to overcome the procedural default.[28]

Further, no reason to excuse the default is apparent on the face of the record.  As the Court of Appeal reasoned, and consistent with Petitioner's assertions in his Petition, Petitioner was aware of the basis of his ineffective assistance of counsel and prosecutorial misconduct claims at the time of trial.  In his verified Petition, Petitioner avers that he informed his trial counsel that detectives had elicited an identification from Jasicki by showing only a single photograph of Petitioner.  (ECF No. 30-2 at 19, 43; *see also* ECF No. 30-1 at 33.)  Petitioner also avers that he specifically requested that trial counsel subpoena Paris to testify that Petitioner was not involved in the shooting.  (*Id.* at 37, 44.)  The basis for all of Petitioner's other arguments were similarly apparent at the time of trial,

---

[28]    As the Court discussed above in addressing Petitioner's sufficiency of evidence arguments and throughout this Order, this is not that rare case where a constitutional violation has probably resulted in the conviction of one who is actually innocent.  *See Murray*, 477 U.S. at 496.

*i.e.*, Petitioner was unable to confront and cross-examine the alleged victims in Counts 2 through 5 because they were never identified by the prosecution,[29] the failure to investigate the area surrounding the shooting, particularly the vantage point described by Jasicki at trial, and the failure to adequately investigate the prosecution's attempt to induce Jasicki to testify against Petitioner. (*See* ECF No. 30-1 at 31–39.)[30]

Accordingly, the Court finds Petitioner's grounds are procedurally defaulted, and no reason exists to excuse such default. Even if Petitioner's claims were not procedurally defaulted, the Court finds that he is not entitled to the relief sought for the reasons discussed below.

**E.    Petitioner is Not Entitled to Relief on His Ineffective Assistance of Trial Counsel (Claim Six)**

1.    <u>Argument</u>

As discussed above, in Claim Six, Petitioner argues that he was deprived of his federal right to due process under the Fifth, Sixth, and Fourteenth Amendments due to ineffective assistance of trial counsel. (Pet. ¶ 56; ECF No. 30-1 at 31–33.) Respondent

---

[29]    Petitioner himself made this argument to the trial judge at the time of trial. (*See* ECF No. 37-12 at 54.)

[30]    The Court notes that the People called Jasicki at trial and asked her how she was able to see the shooting from where she was located. (ECF No. 36-10 at 115–42.) The People also asked Jasicki about her various interviews and the inconsistencies in her statements, as well as her agreement to go into witness protection. (*Id.* at 142–50, 171–75, 178–79.) On cross-examination, Petitioner's counsel asked Jasicki about her statements to the police and the prosecutor, including new information she gave the prosecutor the day before she testified. (*Id.* at 154–62, 166–71, 76–78.) Petitioner's counsel also asked Jasicki about her decision to go into witness protection in June 2015 and the cash payments and assistance she received from the government. (*Id.* at 161–62, 168–69.) He also cross-examined her about the unrecorded portion of her interview with the prosecutor and police. (*Id.* at 160–78.) Lastly, Jasicki first identified Petitioner as the shooter in 2012, three years before she entered witness protection. (*See* ECF Nos. 36-10 at 143–44; 36-11 at 168–69.) Her 2012 interview in which she identified Petitioner was also played for the jury. (ECF No. 36-11 at 179–80.)

argues that Petitioner's ineffective assistance of counsel claims lack merit because he fails to show counsel's performance was ineffective and there was resulting prejudice.  (ECF No. 34-1 at 46–51.)

> ### 2.    Court of Appeal Decision

In its September 7, 2023 decision, the Court of Appeal addressed the merits of Petitioner's ineffective assistance of counsel argument as follows:

> Simpson's claims of ineffective assistance of counsel also do not state a prima facia case for habeas corpus relief.  To establish a claim of ineffective assistance of counsel, the petitioner must show that counsel's decisions were objectively unreasonable and that, but for those decisions, there is a reasonable probability the petitioner would have obtained a better outcome at trial.  (*Smith v. Robbins* (2000) 528 U.S. 259, 285 (*Smith*); *Strickland v. Washington* (1984) 466 U.S. 668, 690, 694; *People v. Ledesma* (1987) 43 Cal. 3d 171, 215-218.)  Although Simpson claims that trial counsel was deficient by failing to adequately investigate the area of the shooting, his contention that further investigation would have provided exonerating evidence relies on conclusory and self-serving allegations that lack any objective evidentiary support.  He also claims counsel failed to adequately pursue a co-participant in the shooting as a potentially exonerating witness for his defense.  However, counsel was justified in not pursuing this coparticipant as a witness, since an alleged fellow gang member of Simpson's who pleaded guilty to participating in the shooting would likely not be a credible witness to the jury.  Simpson also claims that trial counsel failed to adequately challenge Jasicki's credibility, given the highly suggestive method used by law enforcement during the identification process, among other issues.  As previously discussed, however, the identification method at issue in this case was not unduly suggestive or unreliable.  To the extent there were additional reasons to doubt Jasicki's credibility, such as her prior inconsistent statements, or the fact that she had received thousands of dollars from the government in exchange for her cooperation, those facts were disclosed by the prosecution and brought to the jury's attention, and it is unclear what further investigation by the defense would have elicited.

> In general, trial counsel had no obligation to present every argument, witness, and piece of evidence that Simpson wanted counsel to present.  (*Smith, supra,* 528 U.S. at p. 288; *People v. Cunningham* (2001) 25 Cal. 4th 926, 1033; *Redante v. Yockelson* (2003) 112 Cal. App. 4th 1351, 1357.)  Counsel's decisions whether to file motions, whether to object to the

admission of evidence at trial, and what witnesses to call at trial are all tactical decisions for counsel to make, are accorded substantial deference by reviewing courts, and rarely establish counsel's incompetence. (*See, e.g., People v. Riel* (2000) 22 Cal. 4th 1153, 1185 [failure to object]; (*People v. Turner* (1992) 7 Cal. App. 4th 1214, 1220, 1222 [failure to file pretrial motion to suppress].) In this case, Simpson has provided no declarations from trial counsel or any other attorney regarding trial counsels' performance or whether any deficiency in his trial counsel's performance caused him prejudice. (*See Strickland, supra*, 466 U.S. at p. 687; *People v. Ledesma, supra*, 43 Cal. 3d at pp. 215-218.) For these reasons, Simpson has not met his burden of establishing ineffective assistance of trial counsel.

(ECF No. 39-7 at 4–6.)

### 3.    Applicable Law

Federal courts address ineffective assistance of counsel claims under the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney "made errors so serious that he or she was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," and (2) "that the deficient performance prejudiced the defense." *Williams*, 529 U.S. at 390 (quoting *Strickland*, 466 U.S. at 687)). To establish ineffectiveness, the "defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 390–91 (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 391 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694). Additionally, any review of the attorney's performance must be "highly deferential" and must adopt "counsel's perspective at the time" of the challenged conduct to avoid "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id.* Ineffective assistance of counsel under Strickland requires a showing of deficient performance of counsel resulting

in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotation marks and citations omitted).

If the state court has already rejected an ineffective assistance of counsel claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The Supreme Court emphasized that: "We take a highly deferential look at counsel's performance . . . through the deferential lens of § 2254(d)." *Id.* (citations and internal quotation marks omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (citations and internal quotation

marks omitted). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (internal quotation marks and citations omitted).

### 4. Analysis

Petitioner argues that the Court of Appeal identified the correct, governing legal rule but unreasonably applied it to the facts. (ECF No. 30-1 at 31.) Petitioner argues that if his trial counsel had made different choices, "the evidence would have [collectively] established that Petitioner could not have been the shooter, and would have further raised serious questions as to the reliability of [the] prosecution's already weak evidence." (*Id.* at 38.) Specifically, Petitioner argues that his trial counsel rendered ineffective assistance in the following ways: (1) by failing to effectively challenge the suggestive identification procedure adopted by the police with respect to Jasicki; (2) by failing to challenge the denial of Petitioner's right to confront and cross-examine the alleged victims in counts two through five; (3) by failing to investigate or subpoena Paris, who pleaded guilty to counts two through five in connection with the June 14, 2011 shooting; (4) by failing to investigate—or request a private investigator to investigate—the area surrounding the shooting, particularly the vantage point described by Jasicki; (5) by failing to adequately investigate prosecutorial misconduct in the attempt of the prosecution to induce Jasicki to testify against Petitioner. (*Id.* at 31–39.)

The Court has reviewed the record and finds that the Court of Appeal's decision was not contrary to, and was not an unreasonable application of, the *Strickland* standard. *See Yarborough*, 540 U.S. at 5. As determined by the Court of Appeal, counsel's conduct fell within the wide range of reasonable professional assistance. *See id.* Petitioner has not established that his trial counsel's representation amounted to incompetence under prevailing professional norms. *See Harrington*, 562 U.S. at 105.

As the Court of Appeal noted, and as previously discussed herein, Jasicki's testimony, credibility, and potential bias was fully developed. Her prior inconsistent statements and the fact she had received thousands of dollars from the government in

exchange for her cooperation and received witness protection were facts disclosed by the prosecution and addressed at trial before the jury.  (ECF No. 36-10 at 114–79.)  The People also played for the jury Jasicki's 2012 interview, during which she identified Petitioner for the first time as the shooter.  (*See* ECF Nos. 36-10 at 143–44; 36-11 at 179–80.)  In addition to cross-examination, trial counsel addressed during closing arguments Jasicki's inconsistent statements and the process by which Petitioner was identified in 2012.  (ECF No. 37-14 at 23–26.)  Petitioner has not established that his trial counsel was incompetent under prevailing professional norms.  *See Harrington*, 562 U.S. at 104.

The Court of Appeal also reasonably determined that Petitioner's claim that his trial counsel was deficient for failing to adequately investigate and photograph the area of the shooting was based on conclusory and self-serving allegations that lack any objective evidentiary support.  *See Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002) (citing *Cuppett v. Duckworth*, 8 F.3d 1132, 1139 (7th Cir. 1993) (en banc) ("'[S]elf-serving statements by a defendant that his conviction was constitutionally infirm are insufficient to overcome the presumption of regularity accorded state convictions'"), *as quoted in United States v. Allen*, 153 F.3d 1037, 1041 (9th Cir. 1998)); *Jackson v. Calderon*, 211 F.3d 1148, 1155 (9th Cir. 2000) (unsupported speculation and conclusory allegations regarding an attorney's substandard performance are not sufficient to show either deficient performance or prejudice); *Dows v. Wood*, 211 F.3d 480, 486–87 (9th Cir. 2000) (factually unfounded claim alleging ineffective assistance of counsel presents no basis for federal habeas relief).  Although "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citation omitted), Petitioner has not established that counsel's decision not to independently investigate the area of the shooting was unreasonable.

Other decisions made by trial counsel fell within the wide range of reasonable professional assistance.  *See Strickland*, 466 U.S. at 690 (noting "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"); *Zapien v. Davis*, 849 F.3d 787, 796 (9th Cir. 2015) (finding counsel

wasn't ineffective in failing to call certain witness because "[o]n balance, the risks associated with calling them to testify outweighed the potential benefits").  Here, trial counsel chose not to call Paris to the stand, where his credibility may have been called into question.  (*See* ECF Nos. 37-9 at 161–62, 187–89; 37-10 at 18–23, 23; 37-12 at 39–40.)[31]  Trial counsel did, however, ensure that the jury was made aware of the fact Paris had pleaded guilty to Count 2 and his change of plea form was admitted into evidence.  (*See* ECF Nos. 37-9 at 161–62, 187–89; 37-10 at 83; 37-14 at 94–95.)  Trial counsel further used the change of plea form, which lacked specifics, to urge the jury to infer that Paris had admitted he was the shooter.  (*See* ECF No. 37-14 at 18–19.)  Moreover, although Petitioner sets forth in his declaration his belief that Paris would have testified to Petitioner's lack of involvement, there is no foundation for such an assertion and Petitioner provides no competent evidence that Paris would have testified or what his testimony would have been.

Petitioner further argues that his trial counsel failed to "effectively challenge" Petitioner's right to confront and cross-examine the alleged victims of the June 14, 2011, shooting.  (ECF No. 30-1 at 32.)  However, Petitioner fails to identify the clearly established federal law which gives him this right.  To the extent Petitioner is making an argument regarding the Sixth Amendment's Confrontation Clause,[32] which provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him," the argument must fail.  *Crawford v. Washington*, 541 U.S. 36, 42 (2004); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (noting "the

---

[31]    The Court notes that Petitioner's trial counsel informed the trial court he wanted to call Paris' attorney regarding Paris' plea. (ECF No. 37-10 at 15–16.) Counsel agreed to admit the change of plea form instead to avoid hearsay issues. (*Id.*)

[32]    In his Petition, Petitioner argues that his counsel "failed to challenge the denial of [his] right to confront and cross-examine to the extent that the alleged victims, described in Counts Two through Five, did not testify or appear in any proceeding including arraignment, preliminary hearing, trial, and sentencing." (ECF No. 30-1 at 35.)

Confrontation Clause guarantees an *opportunity* for effective cross-examination" (citation omitted) (emphasis in original)).  The Confrontation Clause refers to witnesses presented against the accused and not to victims who were never called as witnesses.  *See Van Arsdall*, 475 U.S. 673, 679–80 (1986) (holding that, to establish a violation of the Confrontation Clause, the petitioner must show that "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination").  Here, trial counsel made a point to emphasize that the victims were absent, but Petitioner does not identify any deficient performance by counsel with respect to the Confrontation Clause. (*See* ECF Nos. 36-11 at 157–59; 37-14 at 22–23.)

To the extent Petitioner is arguing that his trial counsel should have claimed that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding information on the victims, that argument too must fail.[33]  "To establish a *Brady* violation, a defendant must show that: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the government, regardless of whether the suppression was willful or inadvertent; and (3) the evidence is material to the guilt or innocence of the defendant."  *United States v. Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013).  Here, Petitioner presents no evidence that the People suppressed information on the victims of the June 14, 2011 shooting.  Rather, a police witness testified that they never identified the victims.  (*See* ECF No. 36-11 at 158.)  The prosecution further represented that the victims were never contacted by police, and they did not have the names of the victims.  (ECF No. 37-10 at 22–23.)  Accordingly, Petitioner

_____

[33]    In his declaration, Petitioner argues that his counsel "failed to challenge the denial of [his] right to confront and cross-examine to the extent that the alleged victims, described in Counts Two through Five, were not fully disclosed to the defense in that no names, addresses, or other identifying information was disclosed to the defense for the purposes of investigation and preparing [his] defense."  (ECF No. 30-2 at 44.)

has not established that his trial counsel's decision not to argue the prosecution violated *Brady* was objectively unreasonable.

Given the foregoing, the Court of Appeal's decision was not contrary to, nor was it an unreasonable application of, the *Strickland* standard, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 2254(d).

**F.    Petitioner is Not Entitled to Relief on His Prosecutorial Misconduct Claim (Claim Seven)**

### 1.    Arguments

Lastly, Petitioner argues that he was denied his federal due process rights under the Fifth, Sixth, and Fourteenth Amendments due to prosecutorial misconduct. (ECF No. 30-1 at 39.)  Petitioner argues that he was subjected to official misconduct when police engaged in an improperly suggestive lineup procedure in an attempt to have Jasicki identify Petitioner as the shooter. (*Id.*)  In addition, Petitioner argues that the police may have induced Jasicki to falsely testify against Petitioner during the unrecorded portion of her interview. (*Id.*)  Respondent argues that Petitioner has failed to show that the state court's rejection of his prosecutorial misconduct claim was contrary to, or based on an unreasonable application of, clearly established federal law. (ECF No. 34-1 at 52–53.)

### 2.    Court of Appeal Decision

In its September 7, 2023 decision, the Court of Appeal addressed the merits of Petitioner's prosecutorial misconduct argument as follows:

> Even if Simpson's claims were not procedurally barred, he would not be entitled to relief. A prosecutorial misconduct claim requires the defendant to show that the government used deceptive or reprehensible methods to persuade the court or the jury of the defendant's guilt, and without such misconduct it is reasonably probable that the defendant would have obtained a better result. (*People v. Tully* (2012) 54 Cal. 4th 952, 1010; *People v. Lloyd* (2015) 236 Cal. App. 4th 49, 60-61.)  Simpson contends that during the identification process, police showed Tiana Jasicki a single picture of him, and Jasicki was ultimately the sole witness to positively identify him as the

shooter.  He claims this identification method was unduly suggestive and unreliable, and the prosecution committed misconduct by relying on Jasicki's testimony at trial.  However, courts have repeatedly determined that a single person show-up, or a single person photograph, is not an inherently unfair or suggestive identification procedure.  (*See People v. Sanchez* (2019) 7 Cal. 5th 14, 36; *People v. Chavez* (2018) 22 Cal.App.5th 663, 675; *People v. Martinez* (1989) 207 Cal. App. 3d 1204, 1219-1220.)  In this case, evidence in the record suggests that Jasicki knew Simpson prior to identifying him as the shooter, since she referred to him by his gang moniker when she testified at trial, and she was involved in a romantic relationship with Simpson's alleged fellow gang member.  Jasicki's familiarity with Simpson prior to being shown his photograph by law enforcement further undermines his claim that her identification of him as the shooter was unduly influenced by law enforcement's identification method.  Overall, the fact that Jasicki was shown Simpson's photograph does not, standing alone, establish an impermissibly suggestive identification procedure that could sustain a claim of prosecutorial misconduct.

(ECF No.  39-7 at 3–4.)

### 3.    Applicable Law

A habeas petition alleging prosecutorial misconduct will be granted only when the misconduct "so infec[ted] the trial with unfairness as to make the resulting conviction a denial of due process."  *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)): *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).   Under *Darden*, the first issue is whether the prosecutor's remarks or conduct were improper; if so, the next question is whether such remarks or conduct infected the trial with unfairness.  *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005) (citing *Darden*, 477 U.S. at 181).

### 4.    Analysis

Due process does not necessarily require the exclusion of evidence, including eyewitness identification, that presents serious reliability problems.  *See Perry v. New Hampshire*, 565 U.S. 228, 245–46 (2012).  In certain cases, due process may require the

suppression of an eyewitness identification that is tainted by improper police-arranged procedures.  Due process is implicated only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.  *See Manson v. Brathwaite*, 432 U.S. 98, 107, 109 (1977); *Neil v. Biggers*, 409 U.S. 188, 198 (1972).  Even when the police use such a procedure, however, suppression of the resulting identification is not the inevitable consequence.  *See Brathwaite*, 432 U.S. at 112–113; *Biggers*, 409 U.S. at 198–99.  Instead, due process requires courts to assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification."  *Biggers*, 409 U.S. at 201.  Where the "indicators of [a witness'] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed.  *Brathwaite*, 432 U.S. at 116.  However, absent "a very substantial likelihood of irreparable misidentification," *Simmons v. United States*, 390 U.S. 377, 384 (1968), the reliability and evidentiary value of the identification should be submitted to the jury.  In that case due process is satisfied by the defendant's opportunity to challenge the reliability of the identification before the jury.  *Perry*, 565 U.S. at 245–47.

Here, the Court of Appeal accurately stated the fundamental principle that applies here: absent a significant risk of misidentification, due process does not require the suppression of an arguably unreliable identification.  *See Biggers*, 409 U.S. at 201; *Simmons*, 390 U.S. at 384.  "Although identifications arising from single-photograph displays may be viewed in general with suspicion," due process still requires to courts to assess, on a case-by-case basis, applying the *Biggers* criteria, whether there was a substantial likelihood of misidentification.  *Brathwaite*, 432 U.S. at 116–17.  The factors to be considered in evaluating the likelihood of misidentification include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."  *Biggers*, 409 U.S. at 199–200.

///

Here, as the Court of Appeal pointed out, Petitioner was known to Jasicki prior to identifying him as the shooter. (*See* ECF Nos. 39-7 at 4; 36-10 at 122–44.) She saw Petitioner at Orchord's house the night before the shooting and saw him return the following morning. (ECF No. 36-10 at 122–24.) She was living with Orchord, who is her baby's father, at the time of the shooting and she referenced Petitioner by his gang moniker in her testimony. (*Id.* at 116–17, 122–23.) She testified that she witnessed the argument that occurred, followed by Petitioner firing two or three shots. (*Id.* at 126–33, 141, 144, 166, 174–75.) Petitioner's photograph was presented to her, and she identified him as the shooter. (ECF No. 36-10 at 174–75.) Jasicki's identification occurred three years before she was offered witness protection. (*See* ECF Nos. 36-10 at 143–44; 36-11 at 168–69.) Given the foregoing, the Court finds that the totality of the circumstances indicates there was no substantial likelihood of misidentification. The reliability and evidentiary value of Jasicki's identification was therefore properly left to the jury. Petitioner also had the opportunity to challenge the reliability of the identification before the jury on cross-examination, and he did so. (ECF No. 36-10 at 151–71, 176–78.) Accordingly, the Court finds that the Court of Appeals' rejection of this argument was not contrary to, or based on an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 2254(d).

Petitioner's second argument also fails. Eliciting inadmissible evidence may constitute misconduct when the prosecutor's actions were knowing and intentional. *United States v. Percy*, 250 F.3d 720, 729 (9th Cir.), *cert. denied*, 534 U.S. 1009 (2001); *see also Cook v. Schriro*, 538 F.3d 1000, 1017 (9th Cir. 2008) ("[T]he Supreme Court has held that the knowing use of perjured testimony violates the due process clause[.]"). Here, the People presented the jury with evidence that a portion of Jasicki's interview was unrecorded so that she could contact her father and discuss where she would relocate under witness protection. (ECF No. 36-10 at 142–48, 171–72.) For the safety of the witness, the investigator did not record the phone call. (*Id.* at 171.) All of these facts were presented

to the jury, and Petitioner had an opportunity to cross-examine Jasicki. (*Id.* at 160–62.) Petitioner's speculative argument that something improper may have occurred does not warrant habeas relief. *See Turner*, 281 F.3d at 881 ("'[S]elf-serving statements by a defendant that his conviction was constitutionally infirm are insufficient to overcome the presumption of regularity accorded state convictions'" (citations omitted)); *Cook*, 538 F.3d at 1018 (finding no due process violation where "[g]iving due deference to the state trial court's factual findings, there was simply no perjured testimony or deliberate deception to support [the petitioner's] claimed due process violation").

Accordingly, the Court finds that Petitioner has failed to show that the Court of Appeal's rejection of his prosecutorial misconduct claim was contrary to, or based on an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 2254(d).

### G.  Petitioner is Not Entitled to an Evidentiary Hearing

In his traverse, Petitioner moves for an evidentiary hearing to enable him "to satisfy his remaining burden of proof, namely that the error had a substantial and injurious effect or influence in determining the jury's verdict." (ECF No. 41-1 at 18.) Petitioner does not identify which facts he seeks to develop or the specific basis for his request.

Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999). The relevant standard is as follows:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that --

(A) the claim relies on --

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). The standard for granting such a request is clear:

> To determine whether a petitioner is entitled to an evidentiary hearing under 28 U.S.C. § 2254(e)(2), a court must first determine whether a factual basis exists in the record to support the petitioner's claim. *Insyxiengmay v. Morgan*, 403 F.3d 657, 669–70 (9th Cir. 2005) (quoting *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999)). If the record contains a sufficient factual basis that "refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Landrigan*, 550 U.S. at 474, 127 S.Ct. 1933; *see Pinholster*, 563 U.S. at 171, 131 U.S. 1388 ("[A] federal habeas court is 'not required to hold an evidentiary hearing' when the state-court record 'precludes habeas relief' under § 2254(d)'s limitations.") (citation omitted). If the factual basis for the claim is undeveloped or absent, the next inquiry is whether petitioner "failed to develop" these facts in state court proceedings. *Insyxiengmay*, 403 F.3d at 669–70. Only when a petitioner demonstrates that he did not fail to develop the factual basis for his claim in state court may a federal court proceed to consider whether a hearing is appropriate or required under the framework set forth in *Townsend v. Sain, id.*

*Cook v. Kernan*, 948 F.3d 952, 970–71 (9th Cir. 2020); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

Here, as discussed above, there is "a sufficient factual basis [in the record] that 'refutes the applicant's factual allegations.'" *See Cook*, 948 F.3d at 971 (citations omitted). Further, the U.S. Supreme Court has held that, except in certain specific circumstances, where habeas claims have been decided on their merits in state court, a federal court's review must be confined to the record that was before the state court. *Pinholster*, 563 U.S. at 181–82. Petitioner can only proceed to develop additional evidence in federal court if

either § 2254(d)(1) or § 2254(d)(2) is first satisfied. *See Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) (stating that "an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief[]" (citing *Pinholster*, 563 U.S. at 203 n.20)).

For all the reasons discussed above, Petitioner is not entitled to federal habeas relief pursuant to either § 2254(d)(1) or § 2254(d)(2). Accordingly, Petitioner is not entitled to an evidentiary hearing.

## V.    CONCLUSION

For the reasons set forth above, the Court finds that all grounds raised in the Petition for habeas relief pursuant to 28 U.S.C. § 2254(d) should be rejected, and the Petition should accordingly be denied. Therefore, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that the Petition (ECF No. 30) be **DENIED**.

**IT IS ORDERED** that no later than **February 14, 2025**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to any objections shall be filed with the Court and served on all parties no later than **February 28, 2025**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  January 31, 2025

Hon. Jill L. Burkhardt
United States Magistrate Judge